19-135

MJD ECW

7)
On the mentioned dates (see registrar of action) I was denied Due Process of Law, 14th Amendment, and ADA Title II rights.  In denying an ADA accommodation the MN Family Court of Hennepin County Minneapolis Denied me Due Process of Law.  I have ptsd(due to police brutality and the proceedings that followed), dyslexia and adhd. It is my assertion that  I am not able to properly fill out court paperwork.  If you look at my initial paperwork it is obvious that I have learning disabilities.  I am a perfectly intelligent person have logic and reason but reading and writing are not my strong points.  All paperwork is filed under the 27-FA-13-4239
8)
Attached are copies of MN Parents Day Award, parking receipt from that day, letter from council, registrar of action, a letter from Kelly Trius stating the damages to myself and Jacob from an outsider's perspective, a letter from the DOJ,  a screen shot of the mn courts website showing the notice of non-compliance to the ada and denial of transcript informa papaus.
9)
I started asking for accommodation before 12/28/2014. I have attached a copy of a letter that states the situation from my former council. (see attached)
10)
I have been denied accommodation before and since then.  I have asked both of the judges that were appointed to case 27-FA-13-4239 , the Clerk of Courts, The County, the Disability Law Center, the Attorney General's Office, and DOJ.  The DOJ is by far the most interesting of these. My first contact with the DOJ was on 12/26/2017.  I didn't get a response.  So I called them.  We argued weather or not paperwork was covered under the ADA and it seemed like another stalemate.  6 months go by then I get a call from the DOJ we talk about my case.  Ms. Williams I believe? Asks me if she should fill out my complaint via dictation and I stated that I wanted to get her all the information and that I was not prepared to do that at the moment and that I wanted the paperwork and that i would have my partner fill out any papers I could not. So I go in search of my transcripts and start making a packet.  I'm not exactly the most easy person to deal with my PTSD flares up every time i enter a court office
11)
It is my understanding that, a person needs to understand what is going on, know what it is that they are filling out, and have the ability to communicate with reasonable effectiveness their assertion, to have Due Process of Law.
12)
To gain the skills of reasonable effectiveness I have been demonstrating here, I have been: researching for almost 5 years, this has been assisted by the oyez project, returning to college to take a writing class, a college skills class, spell check, years of abuse from the court system, and actually having access to a computer in my home, and one year of rent free living without paid work. I have taken to listening to the oyez project round the clock and just pick cases that seem interesting or pertinent to this case.  I have also taken to dropping in randomly to the UofM law school to bother professors about my theories about the ada.(they don't want to talk to me but get sucked into the facts of the case and can't help but stare at this train wreck and state that i do in fact have a case)


SCANNED
JAN 17 2019
U.S. DISTRICT COURT MPLS

13)

I will mention this has put a damper on my social life.  People in and around the neighborhood are not at all interested in having discussions about *Tinker v. Des Moines Independent Community School District or Griffin v. Illinois* and lawyers are not so interested in hanging around with an indigent, trans identified person, with invisible disabilities, with the language "fitting" of a person who used to be homeless, who is now a law nerd.  It makes it really hard to make connections when all you have to talk about is children, court, poverty, and trauma.

14)

The Attorney General's Office

July 26, 2018 at 09:18 State Capital with Inna Truis, Jacob Henderson we entered with the intent of resolving the matter of reasonable accommodation with the Attorney General, we went to the desk, they directed us to the offices downtown, we ran into Rose one of our neighbors. Turns out we were supposed to be there to accept an award?  We go to the Attorney General's Office downtown speak with Consumer Services.  Explain that due to not being accommodated my child was taken.  We argue the ada for a while.  I leave them stumped but without concession. I explain that I have to leave to accept an award from the Governor.  We arrive back at the Capital just in time to find out that I was accepting the MN Parent Day Award for the Kelly Trius household.

15)

This is the same household that was stated in previous court dates to make the children poop outside, that the minor child lives in a doll house, that the children are forced to live in hammocks, that we don't have a bath, and many more frivolous accusations.  Those accusations had no merit, which is fine outside a courtroom but it would seem that I don't know how to properly object to lible so if they had stated that I was the reincarnation of hitler it would seem that it stands in the courtroom.

16)

Other fun quotes from the courtroom

From judges

"Your dyslexia may bar you from being a fit parent"

"You need to pay for your accommodation"

"Let us know you find an accommodation"

"There are no accommodations available"

"We don't do that"

"Find your own accommodation"

And my favorite "how are you a 6ft man afraid of a 5ft woman"

17)

From council

"I don't believe they have disabilities, they are just stalling"

"Their house has no bathroom"

"The minor child is forced to live in a doll house"

"Deadbeat"

"It's not like they contribute to the minor child"

"They will make the minor child ride the city bus to school by themselves"

These are only a few example of what we will find in the transcripts.

18)

Not long after our talk with the Attorney General's Office a notice appeared on the MN Courts website.(see attached)

19)

Denial of transcripts

I was denied my transcripts for use in doj complaint after quoting Griffin v illinois

See attached

20)

   Due too but not limited to my disabilities I was denied Due Process.  I am also trans, in poverty, and living in a neighborhood that reflects my demographic and is culturally diverse.  My ex wife and I were pillars of that community.  My ex also is one with invisible disabilities.  The MN Family Court system took advantage of a couple pinned them against each other then watched the chaos ensue.  The DOJ states that this is a rampant problem in the courts across the nation.(see attached) That is not acceptable.  If you have forgotten many Veterans come back from battle with ptsd, anxiety, and many other invisible disabilities.  The Men and Women suffering from these ailments have high divorce rates. There is a high rate of poverty amongst peoples with invisible disabilities.  The reason I am here today is for these people and their children.  My son is back in his homes, my ex and I get along, her husband and I talk often, and my son is improving rapidly, and none of this was done with the help of the courts.
We found our own way.

21)

This document has taken me two months to put together.  I have many more dates and much more evidence.  I am drownding in evidence and dates and recordings and that is why(see next section)

 Gmail

---

## Fwd: challenges

---

**Kelly Ekart** <kellyekart@gmail.com>                                          Mon, Jan 7, 2019 at 12:11 PM
To: patches johnson <communityisaverb@gmail.com>

---------- Forwarded message ----------
From: **Kelly Ekart** <kellyekart@gmail.com>
Date: Sun, Jan 6, 2019, 2:55 AM
Subject: challenges
To: Patches <shag.henderson@gmail.com>

Alright.  This is what I got.  Not exactly what you asked for, but...

love : )

Personal Challenges

Going to court was a non-stop emotional ordeal for Patches (Edward).  During this time, and to this day, being in court proceedings forced them to relive past trauma, specifically from the period when they and their then partner were accosted by officers for sitting on a bench, beaten, their partner raped, both were denied medical care, and their partner lost their baby which she was carrying.  During the period of regular court appearances and summons (DATES), Patches spoke often of/relived other instances of police brutality which they suffered in CA as a homeless teen and young adult, as well as other traumas they suffered at that time such as rape, murder and suicide of friends, and public humiliation such as being spit upon on Christmas Day.   Receiving court paperwork in particular resulted in heightened trauma for several weeks.  It was highly exacerbated following the hearing when Patches was forced to pick a permanent schedule for their time with Jacob the day after learning that their best friend had committed suicide.  Because of their difficulties reading and understanding the legal paperwork, that hearing was the first time Patches fully understood that they would be expected to suggest a schedule that day.  This would later have multiple implication for Patches at work, for Jacob at school, and ultimately for the emotional health of both Jacob and Patches.  In the years immediately prior to the court hearings, Patches discussed their time on the street much less frequently and told primarily humorous stories about that time in their life.

This reliving of past trauma, combined with Patches' ADD and frustration with paperwork resulting from their dyslexia, resulted in multiple long stretches of frenzied, disjointed research and attempts to work with friends to complete the paperwork in repeatedly unsuccessful attempts to gain access to a fair court or mediation hearing.  During these times of frenzied research, Patches would struggle with work, eating, sleeping, and emotional balance.  They would become both utterly focused and utterly frustrated.  They had no one who understood the system they were entangled in who could help them face both the legal barriers and the discrimination barriers they faced, including discrimination regarding their  "lifestyle," their dyslexia and the amount of support necessary to understand forms, and their poverty.  Multiple volunteer services such as the Volunteer Lawyers Network and the Father Project were unable or unwilling to provide legal support during this time.  All they knew was that they were a GOOD father- even the Guardian ad Litem said so!- but that for some reason, the system seemed intent on separating them from their son to the emotional, financial, social, and educational detriment of them both.

Following multiple denials for assistance or for an ADA accommodation, in an attempt to better understand the court

paperwork while paying the bills, Patches enrolled at MCTC and took amongst other courses, remedial English- at which they excelled- and which cost almost $10,000 in student loans over the course of a year. This was done explicitly to improve their reading and writing skills in order to perform better in court. This action demonstrates the extent to which Patches was and remains completely focused on this case and the degree to which it interfered with normal living.

In essence, the injustice resulting from the lack of ADA accommodations throughout the court proceedings has exacerbated Patches' trauma and inflamed their sense of justice to the point where they can accomplish almost nothing else, because their brain is always at work on how to resolve this injustice. In the FOUR YEARS it has taken them to find answers to simple questions such as- is there a Family Court ADA Coordinator, who do I serve paperwork to/make a complaint with regarding ADA violations, and the name of the specific box to check (Federal Issue)- Patches has struggled to complete any other major projects in their life such as vehicle and house repair jobs which they formerly were able to complete. Even 6 months into a deal with their partner to take a year off to focus on this case and their other projects, Patches has still only made moderate progress on their repair projects because doing things like going to the Attorney General's office to find out who to serve (which they didn't know?) not only takes all day, but in fact takes several days both to prepare and to come down off of the experience and to do follow-up. Yet it has been only through actions such as these- time consuming calls to the Department of Justice, visits to the Attorney General, ENDLESS hours listening to Supreme Court hearings through the O Yay! Project, and trips to every single possible person they can think of who might be able to help- that Patches has FINALLY been able to uncover some of the legal information necessary to make a formal complaint regarding the state of MN's Family Court and their stated lack of ADA accommodations for persons with invisible disabilities.

Lastly, please let it be noted that the emotional trauma and single focused determination which have resulted from this violation of ADA law have resulted in enormous strain on Patches' relationships, including the loss of many in their previous community and sheer emotional exhaustion on the part of their few remaining friends and especially their partner.

To reiterate, as a result of the lack of ADA accommodation and access to due process in the MN Family Court system, over the past 4 years Patches has struggled with:

- the loss of meaningful time with his son over an almost 3 year period;
- the resulting challenges facing his son and household as a direct result of being separated from his father (detailed below);
- exacerbated trauma;
- financial loss from lost time at work in order to attend hearings, deal with trauma and meet dictated child-care schedules;
- financial loss in the form of late fees for missed payments due to lost time at work, parking and transportation costs, and school loans;
- financial loss from inability to focus on resume, education-building, or pursue a single line of work;
- financial loss from an inability to focus on projects such as vehicle and house repair work;
- exacerbated poverty and stress as a result of these financial losses;
- loss of appetite, difficulty sleeping, and with maintaining emotional balance;
- loss of community, relationships and friends
- difficulty maintaining a happy, meaningful relationship with their partner

Challenges for Jacob

The court proceedings lack of ADA accommodation and their resultant outcomes have also been particularly detrimental to Jacob. They have:

- Increased the tension between his mother and father, resulting in Jacob feeling caught in the middle and having
- intense emotional outbursts and tantrums regarding differences between his parents households,
- including a strong sense of self-doubt and a need to stick to familiar topics;

- caused a 1 year regression in the area of bed-wetting;
- caused him to stall in school for almost 2 years, especially in the area of reading (like his dad, Jacob also has an IEP and struggles with reading and attention);
- caused Jacob's school to disregard Patches as a responsible parent who had the right to be informed and be provided with paperwork (exacerbating Jacob's school challenges)
- caused a loss of community for Jacob who had known many of his mother and father's previous friends; and
- resulted in a loss of financial support for activities (though never toys, books, food or necessities).

That this is true is evidenced by the fact that after 3 years, when Jacob's mother and father were both so concerned for their son that his mother finally agreed to 50/50 time (negotiated outside the family court system), Jacob almost immediately began to a) regulate his emotions and b) move ahead <u>several</u> reading levels at school.  Today, the school calls Patches to talk with Jacob if he is having a bad day and needs emotional support.  While he will undoubtedly take some time to regain 2 years emotionally and educationally lost to these court proceedings, today he is able to read nightly from books he likes at least every other week, is interested in learning to read, has begun to expand his interests, has significantly improved in the area of emotional self-regulation, feels GOOD about his family, and is gaining confidence in himself and his abilities.

Skip to Main Content Logout My Account Search Menu New Civil Search Refine Search  Back     Location : All MNCIS Sites - Case Search   Images Help

# REGISTER OF ACTIONS

## CASE NO. 27-FA-13-4239

| | | |
|---|---|---|
| In the Marriage of Christine Elaine Henderson and Edward Andrew Henderson | § § § § § § § | Case Type: **Dissolution with Child** <br> Date Filed: **06/11/2013** <br> Location: **- Hennepin Family** <br> Judicial Officer: **Furnstahl, Michael** |

---

### PARTY INFORMATION

| | | | | Lead Attorneys |
|---|---|---|---|---|
| **Petitioner** | **Henderson, Christine Elaine** *Now Known As* **Sobers, Christine Elaine** <br> 5648 28th AVE S <br> Minneapolis, MN 55417 | Female <br> DOB: 04/04/1976 | | **MELANIE PEARL PERSELLIN** <br> *Retained* <br> 763-201-0234(W) |
| **Respondent** | **Henderson, Edward Andrew** <br> 2512 18th AVE S <br> Minneapolis, MN 55407 | Male <br> DOB: 12/26/1981 | | **Pro Se** |

---

### EVENTS & ORDERS OF THE COURT

**DISPOSITIONS**

| | |
|---|---|
| 12/17/2013 | **Dissolution Granted - Judgment** (Judicial Officer: Wray, Tsippi) |
| 12/17/2013 | **Change of name granted** (Judicial Officer: Wray, Tsippi) <br> Party(Henderson, Christine Elaine) |

**OTHER EVENTS AND HEARINGS**

| | |
|---|---|
| 06/11/2013 | <u>Summons and Petition</u> <br> *Summons and Petition* |
| 06/11/2013 | <u>Certificate of Representation</u> |
| 06/11/2013 | <u>Confidential Information Form 11.1 personal information</u> |
| 06/11/2013 | <u>Financial Affidavit for Child Support</u> |
| 06/11/2013 | <u>Affidavit for Proceeding In Forma Pauperis</u> <br> *"Contents of document are not accessible to the public under Access Rule 4, subd. 1(b)".* |
| 06/11/2013 | <u>Affidavit of Service</u> |
| 06/11/2013 | <u>Proposed Order or Document</u> <br> *proposed IFP Order >> sent to Signing Judge on 6/12/13* |
| 06/13/2013 | <u>Order Granting In Forma Pauperis</u> (Judicial Officer: Robben, Patrick D. ) <br> *signed 6/12/13* |
| 06/14/2013 | <u>Notice of Case Assignment</u> (Judicial Officer: Wray, Tsippi ) <br> *AND ORDER SETTING ICMC* |
| 06/14/2013 | <u>Request for Continuance</u> <br> *Letter seeking continuance of ICMC* |
| 07/09/2013 | <u>Initial Case Management Conference</u>  (9:45 AM) (Judicial Officer Wray, Tsippi) <br> *07/03/2013 Continued to 07/09/2013 - Attorney Unavailable - Henderson, Christine Elaine* <br> Result: Held |
| 07/09/2013 | **Taken Under Advisement** (Judicial Officer: Wray, Tsippi ) <br> *Order due* |
| 07/11/2013 | <u>ICMC Order - Opted Out of Early Neutral Evaluation</u> (Judicial Officer: Wray, Tsippi ) <br> *and Order for Pretrial (Wray/Ranum)* |
| 07/11/2013 | <u>Answer and Counterpetition</u> |
| 07/11/2013 | <u>Parenting Financial Disclosure Statement</u> |
| 07/11/2013 | <u>Order Granting In Forma Pauperis</u> (Judicial Officer: Janisch, Karen A. ) <br> *IFP Granted and Signed by Judge Janisch on 07-11-13* |
| 07/11/2013 | <u>Affidavit for Proceeding In Forma Pauperis</u> <br> *"Contents of document are not accessible to the public under Access Rule 4, subd. 1(b)".* |
| 08/20/2013 | <u>Affidavit of Service</u> <br> *Personal Service by Ian Wheat* |
| 09/26/2013 | <u>Other Document</u> <br> *Pretrial Informational Statement* |
| 10/01/2013 | <u>Pre-trial</u>  (1:30 PM) (Judicial Officer Wray, Tsippi) <br> Result: Held |
| 10/01/2013 | **Taken Under Advisement** (Judicial Officer: Wray, Tsippi ) <br> *Order Due* |
| 10/03/2013 | <u>Pre-Trial Order-Dissolution</u> <br> *Wray/Ranum* |
| 10/08/2013 | <u>Other Document</u> <br> *Demand For Notice* |
| 10/08/2013 | <u>Affidavit of Mailing</u> <br> *Affidavit of Service by Mail-Respondent and Melanie Pearl Persellin* |
| 11/26/2013 | <u>Pre-trial</u>  (3:30 PM) (Judicial Officer Wray, Tsippi) <br> Result: Held |
| 11/26/2013 | **Order for Submissions-Under Advisement** (Judicial Officer: Wray, Tsippi ) |

*J & D*

| | |
|---|---|
| 12/02/2013 | **Order-Other** (Judicial Officer: Wray, Tsippi ) |
| | *order re agreement (Wray/Ranum)* |
| 12/06/2013 | **Proposed Order or Document** |
| | *Proposed J & D* |
| 12/06/2013 | **Correspondence** |
| | *Letter to Court* |
| 12/17/2013 | **Findings, Order, Judgment and Decree-Dissolution** (Judicial Officer: Wray, Tsippi ) |
| | *Wray/Ranum* |
| 12/17/2013 | **Name Change Sent to Secretary of State** |
| 12/17/2013 | **Notice of Entry of Judgment** |
| 12/17/2013 | **Judgment** (Judicial Officer: Wray, Tsippi ) |
| 12/17/2013 | **Processed Judgment Entry** |
| 02/06/2014 | **Correspondence** |
| | *Letter to Honorable Wray* |
| 02/06/2014 | **Proposed Order or Document** |
| | *AMENDED Findings of Fact, Conclusions of Law, Order for Judgment, Judgment and Decree* |
| 02/26/2014 | **Findings, Order, Judgment and Decree-Dissolution** (Judicial Officer: Wray, Tsippi ) |
| | *Wray/Ranum "AMENDED"* |
| 02/26/2014 | **Judgment** |
| | *"AMENDED"* |
| 02/26/2014 | **Processed Amended Judgment Entry** |
| 02/26/2014 | **Notice of Entry of Judgment** |
| | *"AMENDED"* |
| 04/02/2014 | **Notice of Motion and Motion** |
| | *Notice of Motion and Motion* |
| 04/02/2014 | **Affidavit-Other** |
| | *Christine Henderson Affidavit with exhibits A-C* |
| 04/02/2014 | **Affidavit of Service** |
| | *Affidavit of Service* |
| 04/16/2014 | **Post Final Decree** (3:00 PM) (Judicial Officer Wray, Tsippi) |
| | Result: Held |
| 04/16/2014 | **Taken Under Advisement** (Judicial Officer: Wray, Tsippi ) |
| | *order due* |
| 04/22/2014 | **Order-Other** |
| | *post final decree issues* |
| 06/18/2014 | **Notice of Motion and Motion** |
| | *Notice of Motion and Motion to Modify Parenting Time* |
| 06/18/2014 | **Affidavit-Other** |
| | *Petitioner's Affidavit of Motion to Modify Parenting Time and Appoint GAL w/ Exhibits* |
| 06/18/2014 | **Affidavit of Service** |
| | *Affidavit of Service by Mail* |
| 07/03/2014 | **Responsive Motion**    Index # 1 |
| | *Responsive Notice of Motion and Motion AND Affidavit of Edward A Henderson* |
| 07/07/2014 | **Notice of Motion and Motion**    Index # 2 |
| | *Reply to Respondent's Notice of Motion to Modify Custody and Request to Move the Minor Child's Residence* |
| 07/07/2014 | **Affidavit of Service**    Index # 3 |
| | *Affidavit of Serivce by Mail* |
| 07/07/2014 | **Affidavit of Service**    Index # 5 |
| | *Affidavit of Personal Service* |
| 07/08/2014 | **Post Final Decree** (11:00 AM) (Judicial Officer Wray, Tsippi) |
| | *motion hearing* |
| | Result: Held |
| 07/08/2014 | **Taken Under Advisement**    Index # 4 (Judicial Officer: Wray, Tsippi ) |
| | *order due* |
| 07/08/2014 | **Order for Submissions-Under Advisement**    Index # 6 (Judicial Officer: Wray, Tsippi ) |
| 07/11/2014 | **Affidavit-Other**    Index # 11 |
| | *Affidavit of Meghan Decker* |
| 07/11/2014 | **Other Document**    Index # 12 |
| | *Bullet Points of Issues in Motion* |
| 07/11/2014 | **Affidavit-Other**    Index # 13 |
| | *Affidavit of Kelly Trius* |
| 07/11/2014 | **Affidavit-Other**    Index # 14 |
| | *of Zeph Rothbart-O'Rourke* |
| 07/18/2014 | **Affidavit-Other**    Index # 7 |
| | *Petitioner's Affidavit in Reply to Respondent's Motion to Relocate Minor Child out of State* |
| 07/18/2014 | **Affidavit-Other**    Index # 8 |
| | *Exhibits A-F to Reply Affidavit* |
| 07/18/2014 | **Affidavit of Service**    Index # 9 |
| | *Affidavit of Service* |
| 07/21/2014 | **Taken Under Advisement**    Index # 10 (Judicial Officer: Wray, Tsippi ) |
| | *order due* |
| 08/15/2014 | **Order-Other**    Index # 15 (Judicial Officer: Wray, Tsippi ) |
| | *re Parenting Time, Move, GAL (Wray/Ranum)* |
| 08/18/2014 | **Notice of Filing of Order**    Index # 16 |
| | *Notice of Entry of Order* |
| 10/09/2014 | **ExParte Motion**    Index # 17 |
| | *Ex Parte Motion* |
| 10/09/2014 | **Affidavit-Other**    Index # 18 |
| | *Affidavit of Stacy Woods* |
| 10/09/2014 | **Proposed Order or Document**    Index # 19 |
| | *Proposed Order* |
| 10/09/2014 | **Affidavit to Appear for Contempt**    Index # 20 |
| | *Affidavit of Service* |

| | |
|---|---|
| 10/13/2014 | **Report of Guardian Ad Litem**    Index # 21 |
| 10/13/2014 | **Other Document**    Index # 22 |
| | *Letter Regarding GAL request for Continuance* |
| 10/15/2014 | **Post Decree Review**  (10:00 AM) (Judicial Officer Wray, Tsippi) |
| | Result: Held |
| 10/15/2014 | **Taken Under Advisement**    Index # 23 (Judicial Officer: Wray, Tsippi ) |
| | *order due* |
| 10/17/2014 | **Order for Hearing**    Index # 24 (Judicial Officer: Wray, Tsippi ) |
| | *and other issues (Wray/Ranum)* |
| 10/17/2014 | **Order-Other**    Index # 25 (Judicial Officer: Wray, Tsippi ) |
| | *re sale of house (Wray/Ranum)* |
| 10/21/2014 | **Notice of Filing of Order**    Index # 26 |
| | *Notice of Entry of Orders* |
| 10/22/2014 | **Certificate of Representation**    Index # 27 |
| 11/07/2014 | **Returned Mail**    Index # 28 |
| 12/15/2014 | **Motion**    Index # 29 |
| 12/15/2014 | **Proposed Order or Document**    Index # 30 |
| | *Proposed Order to Reconsider Award of conduct based Attorney's fees* |
| 12/17/2014 | **Notice of Case Reassignment**    Index # 31 |
| | *to Judge McKeig for Review of Referee Review* |
| 12/19/2014 | **Correspondence**    Index # 32 |
| | *Correspondence Per Rule 115.11* |
| 12/23/2014 | **Report of Guardian Ad Litem**    Index # 33 |
| 12/28/2014 | **Answer**    Index # 34 |
| | *Answer to Objection to Motion to Reconsider Award of Attorney's Fees* |
| 12/28/2014 | **Confidential Information Form 11.2 Attachments**    Index # 35 |
| | *Edward Henerson's school doc.s demonstrating a learning disability* |
| 12/29/2014 | **Post Decree Review**  (11:00 AM) (Judicial Officer Wray, Tsippi) |
| | Result: Held |
| 12/29/2014 | **Taken Under Advisement**    Index # 36 (Judicial Officer: Wray, Tsippi ) |
| | *parties tried to mediate through 1/12/15; unable to resolve issues, so address motion to modify ptg time (and primary residence)* |
| 01/12/2015 | *CANCELED*  **Post Final Decree**  (1:30 PM) (Judicial Officer Wray, Tsippi) |
| | *Other* |
| 02/13/2015 | **Order-Other**    Index # 37 |
| | *ptg time and other issues* |
| 02/16/2015 | **Notice of Filing of Order**    Index # 38 |
| | *Notice of Entry of Order* |
| 03/09/2015 | **Certificate of Attendance-class**    Index # 39 |
| | *Certificate of Attendence Bridging Parental Conflict* |
| 03/13/2015 | **Order for Appointment of Guardian Ad Litem**    Index # 40 (Judicial Officer: Wray, Tsippi ) |
| | *Extension of Appointment (Wray/McKeig)* |
| 04/06/2015 | *CANCELED*  **Post Final Decree**  (10:00 AM) (Judicial Officer Wray, Tsippi) |
| | *Other* |
| 04/13/2015 | **Notice of Withdrawal of Counsel**    Index # 41 |
| | *Motion to withdraw representation* |
| 06/12/2015 | **Notice of Motion and Motion**    Index # 42 |
| | *Amended Notice of Motion and Motion* |
| 06/12/2015 | **Affidavit-Other**    Index # 43 |
| | *Affidavit of Christine Henderson* |
| 06/12/2015 | **Affidavit of Service**    Index # 44 |
| | *Affidavit of Service* |

| | | | |
|---|---|---|---|
| 06/12/2015 | **e-Service** | | |
| | 4thGALfamilynotices@courts.state.mn.us | | |
| | motzko, kelly | Served | 06/12/2015 |
| 06/12/2015 | **e-Service** | | |
| | crustyrooster77@hotmail.com | | |
| | Henderson, Edward Andrew | Served | 06/12/2015 |
| 06/12/2015 | **e-Service** | | |
| | mpp@jspwlaw.com | | |
| | Henderson, Christine Elaine | Served | 06/12/2015 |
| 06/12/2015 | **e-Service** | | |
| | 4thGALfamilynotices@courts.state.mn.us | | |
| | motzko, kelly | Served | 06/12/2015 |
| 06/12/2015 | **e-Service** | | |
| | mpp@jspwlaw.com | | |
| | Henderson, Christine Elaine | Served | 06/12/2015 |
| 06/12/2015 | **e-Service** | | |
| | crustyrooster77@hotmail.com | | |
| | Henderson, Edward Andrew | Served | 06/12/2015 |
| 06/12/2015 | **e-Service** | | |
| | crustyrooster77@hotmail.com | | |
| | Henderson, Edward Andrew | Served | 06/12/2015 |
| 06/12/2015 | **e-Service** | | |
| | mpp@jspwlaw.com | | |
| | Henderson, Christine Elaine | Served | 06/12/2015 |
| 06/12/2015 | **e-Service** | | |
| | 4thGALfamilynotices@courts.state.mn.us | | |
| | motzko, kelly | Served | 06/12/2015 |

| | |
|---|---|
| 07/01/2015 | **Post Final Decree**  (9:00 AM) (Judicial Officer Wray, Tsippi) |
| | Result: Held |
| 07/01/2015 | **Taken Under Advisement**    Index # 45 (Judicial Officer: Wray, Tsippi ) |
| | *order due* |
| 07/01/2015 | **Affidavit for Proceeding In Forma Pauperis**    Index # 46 |
| | *Affidavit of IFP* |

| | |
|---|---|
| 03/03/2016 | Responsive Motion      Index # 56 |
| 03/03/2016 | Affidavit for Proceeding In Forma Pauperis      Index # 57 |
| | *"Contents of document are not accessible to the public under Access Rule 4, subd. 1(b)".* |
| 03/03/2016 | Order Granting In Forma Pauperis      Index # 58 (Judicial Officer: Furnstahl, Michael ) |
| | *Furnstahl/McKeig - Expires 02/28/2017* |
| 03/03/2016 | Affidavit of Service      Index # 59 |
| | *Upon Kate McAnally (Paralegal)* |
| 03/07/2016 | Notice of Case Reassignment      Index # 60 (Judicial Officer: Furnstahl, Michael ) |
| | *to Referee Furnstahl* |
| 03/07/2016 | e-Service |
| | *mpp@jspwlaw.com* |
| | Henderson, Christine Elaine                    Served                    03/07/2016 |
| 03/07/2016 | e-Service |
| | *crustyrooster77@hotmail.com* |
| | Henderson, Edward Andrew                    Served                    03/07/2016 |
| 03/09/2016 | Post Final Decree  (2:30 PM) (Judicial Officer Furnstahl, Michael) |
| | Result: Held |
| 03/09/2016 | Taken Under Advisement      Index # 61 (Judicial Officer: Furnstahl, Michael ) |
| | *order for judgment due* |
| 03/18/2016 | Order-Other      Index # 62 (Judicial Officer: Furnstahl, Michael ) |
| | *order re: tax dependant (McKeig)* |
| 03/18/2016 | e-Service |
| | *mpp@jspwlaw.com* |
| | Henderson, Christine Elaine                    Served                    03/18/2016 |
| 03/18/2016 | e-Service |
| | *crustyrooster77@hotmail.com* |
| | Henderson, Edward Andrew                    Served                    03/18/2016 |
| 03/21/2016 | Notice of Filing of Order by Attorney or Party      Index # 63 |
| | *Notice of Entry of Order* |
| 03/21/2016 | Other Document      Index # 64 |
| | *3-18-16 Order* |
| 03/21/2016 | Affidavit of Service      Index # 65 |
| | *Affidavit of Service* |
| 03/21/2016 | e-Service |
| | *mpp@jspwlaw.com* |
| | Henderson, Christine Elaine                    Served                    03/21/2016 |
| 03/21/2016 | e-Service |
| | *crustyrooster77@hotmail.com* |
| | Henderson, Edward Andrew                    Served                    03/21/2016 |
| 03/21/2016 | e-Service |
| | *crustyrooster77@hotmail.com* |
| | Henderson, Edward Andrew                    Served                    03/21/2016 |
| 03/21/2016 | e-Service |
| | *mpp@jspwlaw.com* |
| | Henderson, Christine Elaine                    Served                    03/21/2016 |
| 03/21/2016 | e-Service |
| | *mpp@jspwlaw.com* |
| | Henderson, Christine Elaine                    Served                    03/21/2016 |
| 03/21/2016 | e-Service |
| | *crustyrooster77@hotmail.com* |
| | Henderson, Edward Andrew                    Served                    03/21/2016 |
| 03/22/2016 | Notice of Motion and Motion for Parenting Time Assistance      Index # 66 |
| | *and Affidavit* |
| 03/22/2016 | Affidavit of Service      Index # 67 |
| 03/29/2016 | Responsive Motion      Index # 68 |
| | *Petitioner's Reply to Respondent's Motion* |
| 03/29/2016 | Affidavit-Other      Index # 69 |
| | *Affidavit of Christine Henderson* |
| 03/29/2016 | Affidavit of Service      Index # 70 |
| | *Affidavit of Service* |
| 03/29/2016 | e-Service |
| | *mpp@jspwlaw.com* |
| | Henderson, Christine Elaine                    Served                    03/29/2016 |
| 03/29/2016 | e-Service |
| | *mpp@jspwlaw.com* |
| | Henderson, Christine Elaine                    Served                    03/29/2016 |
| 03/29/2016 | e-Service |
| | *mpp@jspwlaw.com* |
| | Henderson, Christine Elaine                    Served                    03/29/2016 |
| 04/06/2016 | Post Final Decree  (11:00 AM) (Judicial Officer Furnstahl, Michael) |
| | Result: Held |
| 04/06/2016 | Order for Submissions-Under Advisement      Index # 71 (Judicial Officer: Furnstahl, Michael ) |
| | *response from Pet. regarding statement presented at hearing by resp.* |
| 04/25/2016 | Correspondence      Index # 72 |
| 04/25/2016 | e-Service |
| | *mpp@jspwlaw.com* |
| | Henderson, Christine Elaine                    Served                    04/25/2016 |
| 04/25/2016 | e-Service |
| | *crustyrooster77@hotmail.com* |
| | Henderson, Edward Andrew                    Served                    04/25/2016 |
| 04/26/2016 | Taken Under Advisement      Index # 73 (Judicial Officer: Furnstahl, Michael ) |
| | *order due* |
| 04/29/2016 | Order Denying Motion      Index # 76 (Judicial Officer: Furnstahl, Michael ) |
| | *(Furnstahl/McKeig)* |

| | |
|---|---|
| 04/29/2016 | **e-Service** |
| | *mpp@jspwlaw.com* |
| | Henderson, Christine Elaine       Served       04/29/2016 |
| 05/02/2016 | **Notice of Filing of Order by Attorney or Party**    **Index # 74** |
| | *Notice of Entry of Order* |
| 05/02/2016 | **Affidavit of Service**    **Index # 75** |
| | *Affidavit of Service* |
| 05/02/2016 | **e-Service** |
| | *mpp@jspwlaw.com* |
| | Henderson, Christine Elaine       Served       05/02/2016 |
| 05/02/2016 | **e-Service** |
| | *mpp@jspwlaw.com* |
| | Henderson, Christine Elaine       Served       05/02/2016 |
| 05/31/2017 | **Notice of Motion and Affidavit**    **Index # 77** |
| | *for parenting time assistance* |
| 05/31/2017 | **Affidavit for Proceeding In Forma Pauperis**    **Index # 78** |
| | *"Contents of document are not accessible to the public under Access Rule 4, subd. 1(b)".* |
| 05/31/2017 | **Order Granting In Forma Pauperis**    **Index # 79** (Judicial Officer: Furnstahl, Michael ) |
| | *(Furnstahl/Robben) Expires: 05/30/2018* |
| 06/05/2017 | **Affidavit of Service**    **Index # 80** |
| 06/05/2017 | **Correspondence for Judicial Approval**    **Index # 81** |
| | *Correspondence* |
| 06/05/2017 | **e-Service** |
| | *mpp@jspwlaw.com* |
| | Henderson, Christine Elaine       Served       06/05/2017 |
| 06/14/2017 | **Notice of Hearing**    **Index # 82** |
| | *furnstahl- notice of rescheduled hearing* |
| 06/14/2017 | **e-Service** |
| | *mpp@jspwlaw.com* |
| | Henderson, Christine Elaine       Served       06/14/2017 |
| 07/24/2017 | **Notice of Motion and Motion for Parenting Time Assistance**    **Index # 83** |
| | *Reply to Respondent's Motion for Parenting Time Assitance* |
| 07/24/2017 | **Affidavit-Other**    **Index # 84** |
| | *Affidavit of Christine Sobers* |
| 07/24/2017 | **Affidavit of Service**    **Index # 85** |
| | *Affidavit of Service* |
| 07/24/2017 | **e-Service** |
| | *mpp@jspwlaw.com* |
| | Henderson, Christine Elaine       Served       07/24/2017 |
| 07/24/2017 | **e-Service** |
| | *mpp@jspwlaw.com* |
| | Henderson, Christine Elaine       Served       07/24/2017 |
| 07/24/2017 | **e-Service** |
| | *mpp@jspwlaw.com* |
| | Henderson, Christine Elaine       Served       07/24/2017 |
| 08/02/2017 | **Post Final Decree**  (1:30 PM) (Judicial Officer Furnstahl, Michael) |
| | *06/29/2017 Continued to 07/27/2017 - Attorney Unavailable - Henderson, Christine Elaine* |
| | *07/27/2017 Reset by Court to 08/02/2017* |
| | Result: Held |
| 08/08/2017 | **Order-Other**    **Index # 86** (Judicial Officer: Furnstahl, Michael ) |
| | *Review Hearing; Furnstahl/Wahl* |
| 08/08/2017 | **e-Service** |
| | *mpp@jspwlaw.com* |
| | Henderson, Christine Elaine       Served       **Index # 87**       08/08/2017 |
| 10/25/2017 | **Notice of Motion and Motion for Parenting Time Assistance**    **Index # 87** |
| 10/25/2017 | **Affidavit-Other**    **Index # 88** |
| | *in response to motion for parenting time assistance* |
| 10/25/2017 | **Certificate of Attendance-class**    **Index # 89** |
| 10/25/2017 | **Other Document**    **Index # 90** |
| | *Exhibit A* |
| 10/25/2017 | **Other Document**    **Index # 91** |
| | *Exhibit B* |
| 10/25/2017 | **Other Document**    **Index # 92** |
| | *Exhibit C* |
| 10/25/2017 | **Other Document**    **Index # 93** |
| | *Exhibit D* |
| 10/25/2017 | **Other Document**    **Index # 94** |
| | *Exhibit E* |
| 11/07/2017 | **Post Decree Review**  (11:00 AM) (Judicial Officer Furnstahl, Michael) |
| | *Review Hrg* |
| | Result: Held |
| 11/07/2017 | **Affidavit of Mailing**    **Index # 95** |
| 11/07/2017 | **Order for Submissions-Under Advisement**    **Index # 96** (Judicial Officer: Furnstahl, Michael ) |
| | *Proposed findings from parties re PT* |
| 11/27/2017 | **Taken Under Advisement**    **Index # 97** (Judicial Officer: Furnstahl, Michael ) |
| 11/27/2017 | **Proposed Order or Document**    **Index # 98** |
| | *Petitioner's Proposed Decree* |
| 11/27/2017 | **Affidavit-Other**    **Index # 99** |
| | *Exhibit A to Petitioner's Proposed Decree* |
| 11/27/2017 | **e-Service** |
| | *mpp@jspwlaw.com* |
| | Henderson, Christine Elaine       Served       11/27/2017 |
| 11/27/2017 | **e-Service** |



  7:20 PM

ⓘ www.mncourts.gov/GetForm   [29]   ⋮



MINNESOTA
JUDICIAL BRANCH

# COURT FORMS

 **Sign up to receive updates**

Court Forms do not yet adhere to accessibility standards. For assistance, please visit the **Americans with Disabilities Act Accommodation page**.

Please go to the **Help Topics Homepage** to learn more about what forms you may need and find other resources related to many of the topics listed



🕪 🕐 ▼ ◢ 🔋 7:09 PM

# COURT FORMS

💬 **Sign up to receive updates**

Court Forms do not yet adhere to accessibility standards. For assistance, please visit the **Americans with Disabilities Act Accommodation page**.

Please go to the **Help Topics Homepage** to learn more about what forms you may need and find other resources related to many of the topics listed below.

**Contact a Self-Help Center**

**Help Topics Homepage**

27-FA-13-4239

Filed in Fourth Judicial District Court
12/28/2014 4:45:56 PM
Hennepin County Family, MN

CONFIDENTIAL                                    FOR USE OF AUTHORIZED PERSONNEL ONLY

MONTEREY PENINSULA UNIFIED SCHOOL DISTRICT
SPECIAL EDUCATION TOTAL RE-ASSESSMENT PROCEDURAL OUTLINE AND REPORT

Name: ___Henderson, Andrew_____   Date: _____9/18/94_____

Birthdate: __12/26/82___ Age: __12-8___   School: __Los Arboles_____

Grade: __6___ Teacher: _____   Month/Year Tested: _____

Referral:

Routine re-assessment of special education student. Refer to previous case study, 2/7/91 for background.

BACKGROUND:

Andrew attended Robert Down School in Pacific Grove through second grade; placed in RSP in 1st and 2nd grade due to learning disorder in reading and written expression. In 1st grade at age 7-0 (12/89) Andrew was diagnosed with ADD; he has been successfully treated with Ritalin to reduce problems of inattention, impulsivity and hyperactivity.

TEST RESULTS:

ACADEMIC ACHIEVEMENT:

3/94       Woodcock Johnson Psycho-Educational Battery Test of Achievement-R
(Brandewie)

| | Grade Equivalent | Percentile | Standard Score |
|---|---|---|---|
| Chronological Age:     11-2 | | | |
| Broad Reading | 5.0 | 39 | 96 |
| Broad Math | 6.6 | 80 | 112 |
| Broad Written Language | 3.7 | 13 | 83 |
| Broad Knowledge | 6.4 | 65 | 106 |

LEARNING ABILITY:

8/94       Wechsler Intelligence Scale for Children III
(Morriss)

| | Standard Score |
|---|---|
| Verbal | 112 |
| Performance | 81 |
| Full Scale | 97 |

(See WISC-III profile attached)

27-FA-13-4239

Henderson, Andrew                                        9/18/94
Page Two

<u>TEST RESULTS</u>: Continued

   <u>PERCEPTUAL-MOTOR SKILLS</u>:

         Visual-perceptual and visual-motor problems are evident.

<u>CONCLUSIONS</u>:

Learning potential is estimated to be Average to High Average for chronological age. A significant discrepancy between ability and academic skills is evident in the presence of visual processing problems. Andrew continues to demonstrate both eligibility and need for special education services under the guidelines of California Title 5 Regulations.

<u>RECOMMENDATIONS</u>:

Placement in the Learning Handicapped program (RSP) should continue as per IEP team review recommendations.

The goals and objectives for the special education program are specified on the IEP.

                                       Richard Morriss, Ph.D.
                                       School Psychologist

RM/cz

27-FA-13-4239

*Monterey County SELPA*
# Individualized Education Program
## CONSENT PAGE

Student: __Henderson__ __Andrew__   School: __M.H.S.__   ☐ Initial IEP
LAST NAME   FIRST NAME   BD: __12-26-82__   ☒ Review IEP

RATIONALE FOR PLACEMENT: Andrew continues to qualify for Special education under Calif. II regulations

All services on this IEP will continue until the next review date unless otherwise noted here:

REGULAR EDUCATION / TRANSITION   P.E., Geometry, Eng I, Auto I

PROFICIENCY STANDARDS:
☒ Regular  ☐ Differential (describe)
☐ Alternative (describe)

EXTENDED SCHOOL YEAR:
☒ Not required to maintain this student's progress.
☐ Needed, due to severity of disability.
☐ To be determined at end of year.

Pre Vocational / Vocational: Goal(s)#
Study skills

COMMENTS (low incidence needs, specialized health care, regular program modifications, other support services, subject areas addressed by special education, etc.)

Andrew has been mainstreamed with accomodations at Los Angeles this last year. He has had varried success depending on adjustments made by teachers, parents and Andrew. He will continue to need support and accomodation in each mainstream academic. We will have him in RSP study skills and health.

Currently taking Ritalin & Tenex
Per. Dr. P. Hansen
Neurologist

*This Individualized Educational Program (I.E.P.) tells about what we want to teach your child during the coming year. It is not a contract which guarantees that your child will learn all of these things. If you do not agree with all of the parts of this program, then we will provide only the teaching and services approved by you.*

## PARENTAL CONSENT

I HAD THE OPPORTUNITY TO HELP DEVELOP THIS INDIVIDUALIZED EDUCATION PROGRAM AND RECEIVED A NOTICE OF PARENT RIGHTS.

☒ I AGREE WITH THE PLACEMENT, GOALS AND OBJECTIVES OF THIS IEP

☐ I AGREE WITH THE PLACEMENT, GOALS AND OBJECTIVES OF THIS IEP EXCEPT AS FOLLOWS:

☐ I DISAGREE ENTIRELY WITH THIS IEP
☐ I REFUSE PLACEMENT AT THIS TIME

MEETING DATE __4/17/97__   CASE CARRIER __Psychologist__

| | AGREE WITH IEP | DISAGREE WITH IEP |
|---|---|---|
| ADMINISTRATOR/DESIGNEE | ☒ | ☐ |
| SPECIAL EDUCATION TEACHER | ☒ | ☐ |
| SIGNATURE AND TITLE   Los Angeles SDC | ☒ | ☐ |
| SIGNATURE AND TITLE | ☐ | ☐ |
| SIGNATURE AND TITLE | ☐ | ☐ |
| SIGNATURE AND TITLE | ☐ | ☐ |
| SIGNATURE AND TITLE | ☐ | ☐ |

SIGNATURE OF PARENT/GUARDIAN   4/17/97   DATE
(Nancy B. Henderson)   SIGNATURE OF PARENT/GUARDIAN   4/17/97   DATE
E. Andrew Henderson   SIGNATURE OF STUDENT   4-17-97   DATE

PARENT ATTENDED MEETING: ☒ Yes  ☐ No

PARENTS   PAGE ____ OF ____

SPED 102 (Rev 6/93)

Filed in Fourth Judicial District Court
12/28/2014 4:43:01 PM
Hennepin County Family, MN

From:                                                              Dec.28, 2014

John Barham

621 West Lake St., Suite 203

Minneapolis, MN 55408


To:

The Honorable Tsippi Wray

Hennepin County Family Justice Center

110 South Fourth St.

Minneapolis, MN 55401


The Honorable Anne K. McKeig

Hennepin County Family Justice Center

110 South Fourth St.

Minneapolis, MN 55401


**Re:  In the Marriage of Christine Henderson and Edward Henderson**

**Court File No.  27-FA-13-4239**


**Answer to formal objection to Respondent's Motion to Reconsider Award of Conduct based attorney's fees, dated Dec.19.**


Dear Honorable Wray and Honorable McKeig:

At the hearing of Oct. 15, counsel for the Respondent objected to the award of $500 in conduct based attorney's fees requested in Petitioner's Proposed Order granting Emergency Relief to Facilitate the Sale of the Marital Homestead, part of a packet dated Oct.9, 2014.  At the hearing, it appeared that Petitioner's Proposed Order had not been served on Referee Wray.  Referee Wray said that she would rule on the matter after the hearing.

At the hearing on Oct. 15th counsel for the Respondent appeared for the first time in this matter and attempted to turn in a paper certificate of representation to the Court.  Counsel was told that the certificate had to be provided to the Court via efiling.  Counsel then verified that it was not necessary to efile that same day.  At the hearing, counsel for the respondent provided a business card to counsel for the Petitioner.

Due to difficulty navigating the efiling system, counsel for the respondent was not able to efile the certificate of representation until Oct.22.

Counsel for the Respondent was not aware of the Court's decision in this matter until notice was received via a letter from counsel for the Petitioner dated Nov. 11.

Counsel for the Respondent has requested that the award of conduct based attorney's fees be reviewed in light of Respondent's learning disability.  (Enclosed with this letter please find copies of Respondent's school records giving evidence of his learning disability.)

After the hearing on Oct. 15,  Respondent provided counsel with his file of paperwork related to the present case.  Counsel was somewhat taken aback by the poor spelling, penmanship, and difficulty using written communication as evidenced by Respondent's handwritten filings.  In a Nov. meeting with Respondent to discuss the Court's award of the attorney's fees against him, Respondent informed counsel that he was dyslexic.  On counsel's request, Respondent moved to obtain school records concerning his disability.  These were provided to counsel on approximately Dec.8.  Counsel hoped to obtain more in the way of records from Respondent's middle and elementary schools, but these efforts were frustrated by the holiday schedule.

Since the Oct.15 hearing, via work with Respondent, counsel believes that Respondent has significant problems both in using and understanding written language.  It is counsel's belief that Respondent's inability to comprehend the real estate paperwork that led to delays, and not a desire by Respondent to frustrate the sale of the home.

With regard to the Motion to Reconsider Award of Conduct Based Attorney Fees filed on Dec.15, counsel for the Respondent communicated with the Referee Wray's clerk via telephone.  Counsel was concerned that the motion might be barred by Rule 59,03 of the MN Rules of Civil Procedure.  After explaining that counsel had not been informed of the Court's decision until Nov., the clerk consulted with referee Wray and the date of Jan. 12 was provided for the hearing.  While looking at the text of Rule 59.03, counsel noted that while the period for response is thirty days, the 2000 Advisory Comment states that "*The single purpose of the amendment of this Rule 59.03 in 2000 is to create a longer and more reasonable period in which to hear post-trial motions.*"  Given the advisory comment, counsel believes that the filing of the Motion to Reconsider the Award of Conduct based attorney's fees does not go against the spirit of the Rule.

Finally, with regard to the timely filing of motions, Counsel for the Respondent would like to draw attention to the fact that leading up to the hearing on Oct.15, counsel for the Petitioner filed paperwork on Oct.9 and Oct.13.  The Oct. 9 filing being the packet containing Petitioner's Proposed Order granting Emergency Relief to Facilitate the Sale of the Marital Homestead, and the Oct. 13 filing, an objection to the rescheduling of a hearing by the Guardian Ad Litem.  Both were served by mail.  The Oct. 13 paperwork arrived after the hearing had taken place.

Counsel for the Respondent respectfully requests that the Jan. 12, 2015 hearing to review the award of conduct based attorneys fees be allowed to take place.


Thank you,


John Barham,

Counsel for the Respondent


CC Melanie P. Persellin

27-FA-13-4239

Filed in Fourth Judicial District Court
12/15/2014 2:58:36 PM
Hennepin County Family, MN

| | |
|---|---|
| STATE OF MINNESOTA | DISTRICT COURT |
| COUNTY OF HENNEPIN | FOURTH JUDICIAL DISTRICT |
| | FAMILY COURT DIVISION |
| | Court File No. 27-FA-13-4239 |

_____

In the Marriage of:

Christine Elaine Henderson, Petitioner

and

Edward Andrew Henderson, Respondent

_____

MOTION TO RECONSIDER AWARD OF CONDUCT BASED ATTORNEY'S FEES

On the hearing of Oct.15, Petitioner asked the Court for an award of $500 in conduct based attorney's fees. Respondent had only become aware of Petitioner's request on Oct. 13, via a letter from Petitioner's attorneys dated Oct. 9.

On the hearing of Oct. 15, Respondent challenged the proposed award due to his lack of financial means. After the hearing, counsel for Respondent was able to determine that much of Respondent's reluctance about signing the documents related to the sale of the marital home was due to a lack of comprehension of the documents themselves.

Up until the hearing of Oct. 15, Respondent was attempting to negotiate the hearings related to the dissolution of his marriage without the assistance of counsel. This already difficult situation was further exacerbated by the fact that Mr. Henderson suffers from the learning disability, dyslexia. In light of Mr. Henderson's learning disability, counsel for the Respondent respectfully requests that the Court reconsider the award of attorney's fees.

At the next hearing on Dec.29, counsel will provide paperwork confirming Mr. Henderson's diagnosis and educational background as a dyslexic

Respectfully Submitted,

John Barham

12/15/2014



**U. S. Department of Health
And Human Services**
*Office for Civil Rights
Administration for Children
And Families*

**U.S. Department of Justice**

*Civil Rights Division
Disability Rights Section*



**Protecting the Rights of Parents and Prospective Parents with Disabilities:
Technical Assistance for State and Local Child Welfare Agencies and Courts under
Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act**

The United States Department of Health and Human Services (HHS) and the United States Department of Justice (DOJ) are issuing this technical assistance to assist state and local child welfare agencies and courts to ensure that the welfare of children and families is protected in a manner that also protects the civil rights of parents and prospective parents[1] with disabilities. This guidance provides an overview of the issues and application of civil rights laws, answers to specific questions and implementation examples for child welfare agencies and courts, and resources to consult for additional information.

Section 504 of the Rehabilitation Act of 1973 (Section 504)[2] and Title II of the Americans with Disabilities Act of 1990 (ADA)[3] protect parents and prospective parents with disabilities from unlawful discrimination in the administration of child welfare programs, activities, and services.[4] At the same time, child welfare agencies and courts have the responsibility to protect children from abuse and neglect. The goals of child welfare and disability non-discrimination are mutually attainable and complementary. For example, ensuring that parents and prospective parents with disabilities have equal access to parenting opportunities increases the opportunities for children to be placed in safe and caring homes.

<u>**Need for This Technical Assistance**</u>

Both the HHS Office for Civil Rights (OCR) and DOJ Civil Rights Division have received numerous complaints of discrimination from individuals with disabilities involved with the child welfare system, and the frequency of such complaints is rising. In the course of their civil rights enforcement activities, OCR and DOJ have found that child welfare agencies and courts vary in the extent to which they have implemented policies, practices, and procedures to prevent discrimination against parents and prospective parents with disabilities in the child welfare system.

---

[1] The term "parents" includes biological, foster, and adoptive parents. It also includes caretakers such as legal guardians or relatives. Prospective parents include individuals who are seeking to become foster or adoptive parents.
[2] 29 U.S.C. § 794.
[3] 42 U.S.C. §§ 12131-12134.
[4] Children with disabilities also have nondiscrimination protections under Section 504 and Title II of the ADA, but the focus of this technical assistance is on parents and prospective parents with disabilities.

For example, in a recent joint investigation by OCR and DOJ of practices of a State child welfare agency, OCR and DOJ determined that the State agency engaged in discrimination against a parent with a disability.[5] The investigation arose from a complaint that a mother with a developmental disability was subject to discrimination on the basis of her disability because the State did not provide her with supports and services following the removal of her two-day-old infant. The supports and services provided and made available to nondisabled parents were not provided to this parent, and she was denied reasonable modifications to accommodate her disability. As a result, this family was separated for more than two years.

These issues are long-standing and widespread. According to a comprehensive 2012 report from the National Council on Disability (NCD), parents with disabilities are overly, and often inappropriately, referred to child welfare services, and once involved, are permanently separated at disproportionately high rates.[6] In a review of research studies and other data, NCD concluded that among parents with disabilities, parents with intellectual disabilities and parents with psychiatric disabilities face the most discrimination based on stereotypes, lack of individualized assessments, and failure to provide needed services.[7] Parents who are blind or deaf also report significant discrimination in the custody process, as do parents with other physical disabilities.[8] Individuals with disabilities seeking to become foster or adoptive parents also encounter bias and unnecessary barriers to foster care and adoption placements based on speculation and stereotypes about their parenting abilities.[9]

Discriminatory separation of parents from their children can result in long-term negative consequences to both parents and their children. In addition to the OCR and DOJ case where a mother and daughter were deprived of the opportunity for maternal/child bonding for two years, the National Council on Disability report is replete with case studies with similar consequences. For example, a child welfare agency removed a newborn for 57 days from a couple because of assumptions and stereotypes about their blindness, undermining precious moments for the baby and parents that can never be replaced.[10] Similarly, after a child welfare agency removed a three-year-old from his grandmother because she had arthritis and a mobility disability, the toddler developed behavioral issues and progressively detached from his grandmother, though he had had no such experiences before this separation.[11] Any case of discrimination against parents and caregivers due to their disability is not acceptable.

---

[5] Letter from the U.S. Department of Justice, Civil Rights Division and U.S. Department of Health and Human Services, Office for Civil Rights to the Massachusetts Department of Children and Families (Jan. 29, 2015), at www.ada.gov/ma_docf_lof.pdf and www.hhs.gov/ocr/civilrights/activities/examples/Disability/mass_lof.pdf (Massachusetts Department of Children and Families).
[6] National Council on Disability, Rocking the Cradle: Ensuring the Rights of Parents with Disabilities and Their Children at 14, 18 (2012), at www.ncd.gov/publications/2012/Sep272012/.
[7] Id. at 114, 122-26.
[8] Id. at 92-93.
[9] Id. at 194-199.
[10] Id. at 114.
[11] Id. at 125-26.

## Role of HHS and DOJ

The Children's Bureau in the HHS Administration for Children and Families administers funding for child welfare agencies and courts and provides guidance and technical assistance to child welfare agencies regarding child welfare law.  HHS OCR is responsible for ensuring that entities receiving Federal financial assistance from HHS, including child welfare agencies and state courts, comply with their legal obligation under Section 504 to provide equal access to child welfare services and activities in a nondiscriminatory manner.  In addition, both DOJ and HHS OCR enforce Title II of the ADA against public entities, including child welfare agencies and state courts.

## Overview of Legal Requirements

### Title II of the ADA

Title II of the ADA provides that no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by such entity.[12]  Title II of the ADA applies to the services, programs, and activities of all state and local governments throughout the United States, including child welfare agencies and court systems.[13]  The "services, programs, and activities" provided by public entities include, but are not limited to, investigations, assessments, provision of in-home services, removal of children from their homes, case planning and service planning, visitation, guardianship, adoption, foster care, and reunification services.  "Services, programs, and activities" also extend to child welfare hearings, custody hearings, and proceedings to terminate parental rights.

### Section 504 of the Rehabilitation Act

Section 504 provides that no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of any entity that receives Federal financial assistance, or be subjected to discrimination by such entity.[14]  Federal financial assistance includes grants, loans, and reimbursements from Federal agencies, including assistance provided to child welfare agencies and the courts.[15]  An entity can be a recipient of Federal financial assistance either directly or as a sub-recipient.[16]  Section 504 applies to all of the operations of agencies and sub-agencies of state and local governments, even if Federal financial assistance is directed to one component of the agency or for one purpose of the agency.[17]  Recipients of Federal financial assistance must

---

[12] 42 U.S.C. § 12132.
[13] 42 U.S.C. § 12131(1)(A), (B); *see also, e.g.,* 28 C.F.R. § 35.130(b)(1) (prohibiting disability discrimination directly or through contractual, licensing, or other arrangements), 35.130(b)(3) (prohibiting methods of administration that have a discriminatory effect).  Private entities involved in the child welfare system may also be independently covered by Title III of the ADA, 42 U.S.C. §§ 12181-12189.
[14] 29 U.S.C. § 794(a).
[15] *See, e.g.,* 28 C.F.R. § 42.105; 45 C.F.R. § 84.5.
[16] *See Grove City College v. Bell,* 465 U.S. 555, 564 (1984).
[17] 29 U.S.C. § 794(b).

agree to comply with Section 504, and generally other civil rights laws, as a condition of receiving Federal financial assistance.[18]

**Application**

A child welfare agency or court may not, directly or through contract or other arrangements, engage in practices or methods of administration that have the effect of discriminating on the basis of disability, or that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the child welfare agency's or court's program for persons with disabilities.[19]  Under these prohibitions, a child welfare agency could be responsible for the discriminatory actions of a private foster care or adoption agency with which it contracts when those actions are taken in fulfillment of the private entity's contractual obligations with the child welfare agency.  For example, if the private foster care or adoption agency imposed discriminatory eligibility requirements for foster or adoptive parents that screened out prospective parents with HIV, the state child welfare agency would most likely be responsible for the contractor's practice of discriminating on the basis of disability.

Two principles that are fundamental to Title II of the ADA and Section 504 are: (1) individualized treatment; and (2) full and equal opportunity.  Both of these principles are of particular importance to the administration of child welfare programs.

*Individualized treatment.*  Individuals with disabilities must be treated on a case-by-case basis consistent with facts and objective evidence.[20]  Persons with disabilities may not be treated on the basis of generalizations or stereotypes.[21]  For example, prohibited treatment would include the removal of a child from a parent with a disability based on the stereotypical belief, unsupported by an individual assessment, that people with disabilities are unable to safely parent their children.  Another example would be denying a person with a disability the opportunity to become a foster or adoptive parent based on stereotypical beliefs about how the disability may affect the individual's ability to provide appropriate care for a child.

*Full and equal opportunity.*  Individuals with disabilities must be provided opportunities to benefit from or participate in child welfare programs, services, and activities that are equal to those extended to individuals without disabilities.[22]  This principle can require the provision of aids, benefits, and services different from those provided to other parents and prospective parents

---

[18] *See, e.g.,* 45 C.F.R. § 84.5.

[19] *See* 28 C.F.R. § 35.130(b)(3); 45 C.F.R. § 84.4(b)(4); ); *see also* 28 C.F.R. § 42.503(b)(3).

[20] *See, e.g.,* 28 C.F.R. § 35.130(b); *see also* 28 C.F.R. pt. 35, App. B (explaining in the 1991 Section-by-Section guidance to the Title II regulation that, "[t]aken together, the[] provisions [in 28 C.F.R. § 35.130(b)] are intended to prohibit exclusion . . . of individuals with disabilities and the denial of equal opportunities enjoyed by others, based on, among other things, presumptions, patronizing attitudes, fears, and stereotypes about individuals with disabilities.  Consistent with these standards, public entities are required to ensure that their actions are based on facts applicable to individuals and not presumptions as to what a class of individuals with disabilities can or cannot do."); *School Bd. of Nassau County v. Arline,* 480 U.S. 273, 285 (1987).

[21] *See, e.g., id.*

[22] *See* 28 C.F.R. §§ 35.130(b)(1)(ii)-(iv), (vii), (b)(7); 45 C.F.R. § 84.4(b)(1)(ii)-(iii); *see also* 28 C.F.R. § 42.503(b)(1)(ii), (iii).

where necessary to ensure an equal opportunity to obtain the same result or gain the same benefit, such as family reunification.[23]

This does not mean lowering standards for individuals with disabilities; rather, in keeping with the requirements of individualized treatment, services must be adapted to meet the needs of a parent or prospective parent who has a disability to provide meaningful and equal access to the benefit.[24]  In some cases, it may mean ensuring physical or programmatic accessibility or providing auxiliary aids and services to ensure adequate communication and participation, unless doing so would result in a fundamental alteration to the nature of the program or undue financial and administrative burden.[25]  For example, a child welfare agency must provide an interpreter for a father who is deaf when necessary to ensure that he can participate in all aspects of the child welfare interaction.  In other instances, this may mean making reasonable modifications to policies, procedures, or practices, unless doing so would result in a fundamental alteration to the nature of the program.[26]  For example, if a child welfare agency provides classes on feeding and bathing children and a mother with an intellectual disability needs a different method of instruction to learn the techniques, the agency should provide the mother with the method of teaching that she needs.

Under Title II of the ADA or Section 504, in some cases, a parent or prospective parent with a disability may not be appropriate for child placement because he or she poses a significant risk to the health or safety of the child that cannot be eliminated by a reasonable modification.[27]  This exception is consistent with the obligations of child welfare agencies and courts to ensure the safety of children.  However, both the ADA and Section 504 require that decisions about child safety and whether a parent or prospective parent represents a threat to safety must be based on an individualized assessment and objective facts, including the nature, duration, and severity of the risk to the child, and the probability that the potential injury to the child will actually occur.[28]  In addition, if the risk can be eliminated by a reasonable modification of policies, practices, or procedures, or by the provision of auxiliary aids or services, the child welfare agency must take such mitigating actions.[29]  A public entity may impose legitimate safety requirements necessary for the safe operation of its services, programs, or activities, but they may not be based on stereotypes or generalizations about persons with disabilities.[30]

By applying these principles consistently in the child welfare system, child welfare agencies and courts can ensure that parents and prospective parents with disabilities have equal access to parenting opportunities while ensuring children safely remain in or are placed in safe and caring homes.  The attached Questions and Answers provide more detailed information and specific implementation examples for child welfare agencies and courts.

---

[23] See, e.g., 28 C.F.R. § 35.130(b)(1)(ii)-(iv).

[24] Id; see also Alexander v. Choate, 469 U.S. 287 (1985).

[25] 28 C.F.R. §§ 35.149-151, 160-164; 45 C.F.R. §§ 84.21-23, 84.52(d); see also 28 C.F.R. §§ 42.503(e), (f), 42.520-522.

[26] See 45 C.F.R. §§ 84.12(a), 84.22(a) and (f), and 84.52(d); and 28 C.F.R. § 35.130(b)(7).

[27] 28 C.F.R. §§ 35.139(a)-(b); Arline, 273 U.S. at 287.

[28] 28 C.F.R. § 35.139(b); Arline, 273 U.S. at 288.

[29] 28 C.F.R. § 35.139(b); Arline, 273 U.S. at 288.

[30] See 28 C.F.R. § 35.130(h).

## QUESTIONS AND ANSWERS

*1.     What are the basic requirements of ADA Title II and Section 504?*

**Answer:** Title II of the ADA provides that no qualified individual with a disability shall, by reason of such disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination in, the services, programs, or activities of state and local government entities.[31]  Section 504 similarly prohibits discrimination on the basis of disability against qualified individuals with a disability in programs, services, and activities receiving Federal financial assistance.[32]

Under the ADA and Section 504, programs cannot deny people with disabilities an opportunity to participate,[33] and must provide people with disabilities with meaningful and equal access to programs, services, and activities.[34]  Programs and services must be accessible to and usable by people with disabilities.[35]  In addition, programs must provide people with disabilities with an equal opportunity to participate in and benefit from the programs, services and activities of the entity;[36] they are also prohibited from using methods of program administration, which includes written rules as well as agency practices, that have a discriminatory effect on individuals with disabilities.[37]  Moreover, programs must provide reasonable modifications in policies, practices, and procedures when necessary to avoid discrimination;[38] and must take appropriate steps to ensure that communications with applicants, participants, members of the public, and companions with disabilities are as effective as communications with others through the provision of auxiliary aids and services.[39]

## Who is protected by disability nondiscrimination laws?

*2.     Who is considered a person with a disability under Title II of the ADA and Section 504?*

**Answer:**  The ADA and Section 504 protect the rights of individuals with disabilities.[40]  A "disability" is defined as a physical or mental impairment that substantially limits a major life activity, such as caring for oneself, performing manual tasks, breathing, standing, lifting, bending, speaking, walking, reading, thinking, learning, concentrating, seeing, hearing, eating, sleeping, or working.[41]  Major life activities also include the operation of major bodily functions, including but not limited to, functions of the immune system, normal cell growth, digestive,

---

[31] 42 U.S.C. § 12132.
[32] 29 U.S.C. § 794(a).
[33] 42 U.S.C. § 12132; 29 U.S.C. § 794(a); 28 C.F.R. § 35.130(a); 45 C.F.R. § 84.4(a).
[34] *Choate*, 469 U.S. 287.
[35] 28 C.F.R. § 35.150(a); 45 C.F.R. § 84.22(a).
[36] 28 C.F.R. § 35.130(b)(1)(ii); 45 C.F.R. § 84.4(b)(1)(ii);
[37] 28 C.F.R. § 35.130(b)(3); 45 C.F.R. § 84.4(b)(4).
[38] 28 C.F.R. § 35.130(b)(7); *Choate*, 469 U.S. at 301.
[39] 28 C.F.R.§ 35.160(a)(1); *see also* 45 C.F.R. § 84.52(d) (requiring health and social services entities to provide appropriate auxiliary aids to persons with impaired sensory, manual, or speaking skills, where necessary to afford such persons an equal opportunity to benefit from the service in question).
[40] 42 U.S.C. § 12132; 29 U.S.C. § 794(a).
[41] 42 U.S.C. § 12102(1), (2)(A); 29 U.S.C. § 705(9)(B).

bowel, or bladder, neurological, brain, and respiratory, circulatory, endocrine, and reproductive functions.[42]

Congress has made clear that the definition of disability in the ADA and Section 504 is to be interpreted broadly.[43] Even if an individual's substantially limiting impairment can be mitigated through the use of medication; medical supplies, equipment, and devices; learned behavioral or adaptive neurological modifications; assistive technology (e.g. a person with a hearing disability who uses hearing aids that substantially restores the sense of hearing); or reasonable modifications to policies, practices, or procedures, the individual is still protected by the ADA and Section 504.[44] The ADA and Section 504 also apply to people who have a record of having a substantial impairment (e.g., medical, military, or employment records denoting such an impairment), or are regarded as having such an impairment, regardless of actually having an impairment.[45]

An "individual with a disability" under the ADA and Section 504 does not include an individual who is currently engaged in the illegal use of drugs, when the state or local government program or program receiving Federal financial assistance acts on the basis of the illegal drug use.[46] However, an individual is not excluded from the definition of disability on the basis of the illegal use of drugs if he or she (1) has successfully completed a drug rehabilitation program or has otherwise been successfully rehabilitated and is no longer engaging in drug use, or (2) is participating in a supervised rehabilitation program and is no longer engaging in drug use.[47]

To be eligible, an individual with a disability must be "qualified." An individual with a disability is qualified if he or she meets the essential eligibility requirements of a service, program, or activity, with or without the provision of reasonable modifications, the provision of appropriate auxiliary aids and services, or the removal of architectural and communication barriers.[48]

3.    *Who do Title II of the ADA and Section 504 protect in child welfare programs?*

**Answer:** Title II of the ADA and Section 504 protect qualified individuals with disabilities, which can include children, parents, legal guardians, relatives, other caretakers, foster and adoptive parents, and individuals seeking to become foster or adoptive parents, from

---

[42] 42 U.S.C. § 12102(2)(B).

[43] 42 U.S.C. § 12102(4)(A); 29 U.S.C. § 705(9)(B).

[44] 42 U.S.C. § 12102(4)(E)(i); 29 U.S.C. § 705(9)(B); *see also* Equal Employment Opportunity Commission, Questions and Answers on the Final Rule Implementing the ADA Amendments Act of 2008, at www.eeoc.gov/laws/regulations/ada_qa_final_rule.cfm.

[45] 42 U.S.C. § 12102(2)(1)(B)-(C); 29 U.S.C. § 705(9)(B). The ADA Amendments Act of 2008 amended the definition of disability for Titles I, II, and III of the ADA as well as Section 504. Pub. L. No. 110 - 325, 122 Stat. 3553 (2008). For a discussion of the United States Department of Justice's (DOJ's) interpretation of the changes to the definition, see DOJ's Notice of Proposed Rulemaking to Implement ADA Amendments Act of 2008, 79 Fed. Reg. 4839 (January 30, 2014). *See also* Equal Employment Opportunity Commission, Questions and Answers on the Final Rule Implementing the ADA Amendments Act of 2008, at www.eeoc.gov/laws/regulations/ada_qa_final_rule.cfm.

[46] 42 U.S.C. § 12210(a); 29 U.S.C. § 794(d).

[47] 42 U.S.C. § 12210(b)(1)-(2); 29 U.S.C. § 794(d).

[48] 42 U.S.C. § 12131(1); 28 C.F.R. § 35.104; *see also* 45 C.F.R. § 84.3(l)(4) (defining "qualified handicapped person" under HHS' Section 504 regulation).

discrimination by child welfare agencies and courts.[49] Title II also protects individuals or entities from being denied or excluded from child welfare services, programs or activities because of association with an individual with a disability.[50] For example, Title II prohibits a child welfare agency from refusing to place a child with a prospective foster or adoptive parent because the parent has a friend or relative with HIV.

Title II and Section 504 also protect "companions" of individuals involved in the child welfare system when the companion is an appropriate person with whom the child welfare agency or court should communicate. A companion may include any family member, friend, or associate of a person seeking or receiving child welfare services.[51] For instance, when a child welfare agency communicates with an individual's family member who is deaf, appropriate auxiliary aids and services to the family member must be provided by the agency to ensure effective communication.[52]

Finally, the ADA and Section 504 protect individuals from any retaliation or coercion for exercising their right not to experience discrimination on the basis of disability. Individuals enjoy this protection whether or not they have a disability.[53]

### Who is required to comply with the disability nondiscrimination laws?

4.    *What types of child welfare programs and activities are covered by these laws?*

> *All* activities of child welfare agencies are covered by Title II and Section 504, including removal proceedings and agencies' programs and activities must not discriminate on the basis of disability.

**Answer**: Title II covers *all* of the programs, services, and activities of state and local governments, their agencies, and departments.[54] Similarly, Section 504 applies to all of the activities of agencies that receive Federal financial assistance.[55] Therefore, all child welfare-related activities and programs of child welfare agencies and courts are covered, including, but not limited to, investigations, witness interviews, assessments, removal of children from their homes, case planning and service planning, visitation, guardianship, adoption, foster care, reunification services, and family court proceedings. Title II and Section 504 also make child welfare agencies responsible for the programs and activities of private and non-profit agencies that provide services to children and families on behalf of the state or municipality.[56]

---

[49] For a discussion of a "qualified individual with a disability," *see* discussion *supra* at Q&A 2.
[50] 28 C.F.R. § 35.130(g); 28 C.F.R. pt. 35, App. B.
[51] 28 C.F.R. § 35.160(a)(2).
[52] 28 C.F.R. § 35.160(a)(1); 28 C.F.R. pt. 35, App. A., Subpt. E (2010).
[53] 42 U.S.C. § 12203; 28 C.F.R. § 35.134; 45 C.F.R. § 84.61; 45 C.F.R. § 80.7(e).
[54] *See Pa. Dep't. of Corrs. v. Yeskey*, 524 U.S. 206, 209-12 (1998) (discussing the breadth of Title II's coverage).
[55] *See* 29 U.S.C. § 794(b)(1)(A), (B).
[56] *See* 28 C.F.R. §§ 35.130(b)(1), (3), 42.503(b)(1), (3); 45 C.F.R. § 84.4(b)(1), (4).

*5.      Do Title II and Section 504 apply to the programs, services, and activities of family courts?*

**Answer**:  Yes.  State court proceedings, such as termination of parental rights proceedings, are state activities and services for purposes of Title II.[57]  Section 504 also applies to state court proceedings to the extent that court systems receive Federal financial assistance.[58]

Title II and Section 504 require court proceedings to be accessible to persons with disabilities, and persons with disabilities must have an equal opportunity to participate in proceedings.[59]  For example, if a conference or hearing is scheduled in a location that is inaccessible to wheelchair users, it should be moved to an accessible location in order to ensure a wheelchair user can participate fully in the conference or hearing.

Courts are required to provide auxiliary aids and services when necessary to ensure effective communication, unless an undue burden or fundamental alteration would result.[60]  For example, courts should provide appropriate auxiliary aids and services to a parent who is deaf so that he or she can access court proceedings as fully and effectively as those who are not deaf.

Like child welfare agencies, courts must also make reasonable modifications to policies, practices, and procedures where necessary to avoid discrimination on the basis of disability.[61]  For example, it may be necessary to adjust hearing schedules to accommodate the needs of persons with disabilities, if the need for the adjustment is related to the individual's disability.  Or it may be necessary to provide an aide or other assistive services in order for a person with a disability to participate fully in a court event.[62]  Such assistance should be provided unless doing so would result in a fundamental alteration.[63]

---

[57] *See Yeskey*, 524 U.S. at 209-12 (discussing the breadth of Title II's coverage); *cf. Shelley v. Kraemer*, 334 U.S. 1 (1948) (finding judicial enforcement of racially discriminatory restrictive covenants state action in violation of the Fourteenth Amendment). *See also* 28 C.F.R. § 35.190(b)(6) (designating to the DOJ responsibility for investigation of complaints and compliance reviews of "[a]ll programs, services, and regulatory activities relating to . . . the administration of justice, including courts.").

[58] 29 U.S.C. § 794; *see U.S. Dep't of Transp. v. Paralyzed Veterans of America*, 477 U.S. 597, 600 n.4 (1986).  We also remind judges and court personnel of their obligations under the American Bar Association, Model Code of Judicial Conduct, Rule 2.3 (b) that states: "A judge shall not, in the performance of judicial duties, by words or conduct manifest bias or prejudice, or engage in harassment, including but not limited to bias, prejudice, or harassment based upon race, sex, gender, religion, national origin, ethnicity, disability, . . . and shall not permit court staff, court officials, or others subject to the judge's direction and control to do so."

[59] *See* 28 C.F.R. § 35.130; 45 C.F.R. § 84.4; *see also* 28 C.F.R. § 42.503.

[60] 28 C.F.R. § 35.160-.164; 45 C.F.R. § 84.52(d); *see also* 28 C.F.R. § 42.503(f).

[61] 28 C.F.R. § 35.130(b)(7); *see also Choate*, 469 U.S. at 304-06.

[62] In addition, advocacy organizations, such as those within the Protection and Advocacy system, may provide assistance to individuals with disabilities when they become involved with the child welfare system.

[63] *See* 28 C.F.R. § 35.130(b)(7), 35.160-.164;  *see also Choate,* 469 U.S. at 300-309.

6.    *Do Title II and Section 504 apply to private contractors of child welfare agencies and courts?*

**Answer**: Yes. Title II prohibits discrimination in child welfare programs and services when those services are provided by contractors.[64]  Section 504 prohibits discrimination in child welfare programs receiving federal financial assistance, including programs receiving federal financial assistance operated by private entities under contract with child welfare agencies.[65]  Accordingly, to the extent that courts and agencies contract with private agencies and providers to conduct child welfare activities, the agencies should ensure that in the performance of their contractual duties contractors comply with the prohibition of discrimination in Title II and Section 504.[66]

**What do the disability nondiscrimination laws require of child welfare agencies and courts?**

7.    *What is a reasonable modification?*

**Answer**: Under Title II of the ADA and Section 504, child welfare agencies and courts must make changes in policies, practices, and procedures to accommodate the individual needs of a qualified person with a disability, unless the change would result in a fundamental alteration to the nature of the program.[67]  Parenting skills do not come naturally to many parents, with or without disabilities. To provide assistance to parents with disabilities that is equal to that offered to parents without disabilities, child welfare agencies may be required to provide enhanced or supplemental training, to increase frequency of training opportunities, or to provide such training in familiar environments conducive to learning. For example, child welfare agencies may have a parenting skills class once per week. For a parent with a disability who requires individualized assistance in learning new skills because of her or his disability, child welfare agencies may need to modify this training to allow more frequent, longer, or more meaningful training.

8.    *What are auxiliary aids and services?  What does it mean to provide effective communication?*

**Answer**: Child welfare agencies and courts are required to take appropriate steps – including the provision of appropriate auxiliary aids and services – where necessary to ensure that individuals with communication disabilities understand what is said or written and can communicate as

---

[64] *See* 28 C.F.R. § 35.130(b)(1), (3).

[65] 29 U.S.C. § 794(a); 45 C.F.R. §§ 84.3(h); 84.4(b)(1), (4).

[66] Private entities involved in child welfare activities may also be public accommodations with their own nondiscrimination obligations under Title III of the ADA. *See* 42 U.S.C. §§ 12181-12189 (Title III of the ADA).

[67] *See* 28 C.F.R. § 35.130(b)(7); 45 C.F.R. § 84.22(a). A fundamental alteration can be a change that is so significant that it alters the essential nature of the public entity's service, program, or activity. *Id.*; *cf.* U.S. Dep't of Justice, ADA Title III Technical Assistance Manual Covering Public Accommodations and Commercial Facilities § III-4.3600 (discussing a fundamental alteration as a modification that is so significant it alters the essential nature of services, privileges, and accommodations). A fundamental alteration is necessarily highly fact-specific. Child welfare entities have the burden of establishing that a proposed action would fundamentally alter the service, program, or activity or would result in undue financial and administrative burdens. A public entity still must take any other action that would not result in such an alteration or such burdens but would nevertheless ensure that, to the maximum extent possible, individuals with disabilities receive the benefits or services provided by the public entity.

effectively as individuals without disabilities.[68]  Examples of auxiliary aids and services include, among others, qualified interpreters, note takers, computer-aided transcription services, accessible electronic and information technology, written materials, telephone handset amplifiers, assistive listening devices, assistive listening systems, telephones compatible with hearing aids, closed caption decoders, open and closed captioning, telecommunications devices for deaf persons (TDD's), videotext displays, qualified readers, taped texts, audio recordings, braille materials, large print materials, and modifications to existing devices.[69]

Child welfare agencies and courts should consider whether they are taking appropriate steps to ensure that effective communication is provided in different settings and as cases develop.  For example, a qualified interpreter may be necessary for smaller settings involving only a few people, such as home visits or assessments, whereas the use of real-time captioning may be appropriate during larger group meetings, such as family team meetings or in court, where numerous people are present or where the layout of the room makes it difficult to view an interpreter and obtain visual cues from the speaker.

The type of auxiliary aid or service necessary to ensure effective communication will vary in accordance with the method of communication used by the individual with a disability; the nature, length, and complexity of the communication involved; and the context in which the communication is taking place.[70]  For example, a local child welfare agency may be required to provide qualified interpreters to ensure effective communication with individuals with disabilities during agency meetings to discuss service planning.  However, to communicate a simple message such as an appointment date or address, handwritten notes may be sufficient.

> Child welfare agencies must refrain from using minor children as interpreters except in limited exigent circumstances. Adult companions may be used as interpreters only in emergencies and only when other factors are met.

State and local child welfare agencies and courts must give primary consideration to the auxiliary aid or service requested by the individual.[71]  This means, for example, that if a parent with a disability requests a qualified interpreter who is an oral transliterator (a type of interpreter who facilitates spoken communication between individuals who are deaf or hard of hearing and individuals who are not), the agency must provide a qualified oral transliterator, unless the agency can demonstrate that it would pose a fundamental alteration or an undue administrative or financial burden and an alternative auxiliary aid or service provides communication to the individual that is as effective as communication provided to others.[72]  If provision of a particular auxiliary aid or service would result in a fundamental alteration in the nature of a service, program, or activity, or if it would result in undue financial

---

[68] 28 C.F.R. § 35.160; 45 C.F.R. § 84.52(d).
[69] 42 U.S.C. § 12103(1); 28 C.F.R. § 35.104.
[70] 28 C.F.R. § 35.160(b)(2).  For further information on ensuring effective communication, *see* U.S. Dep't of Justice, ADA Requirements: Effective Communication (Jan. 31, 2014), at www.ada.gov/effective-comm.htm; *see also* U.S. Dep't of Justice and U.S. Dep't of Educ., Frequently Asked Questions on Effective Communication for Students with Hearing, Vision, or Speech Disabilities in Public Elementary and Secondary Schools (2015), at www.ada.gov/doe_doj_eff_comm/doe_doj_eff_comm_faqs.pdf.
[71] 28 C.F.R. § 35.160(b)(2).
[72] 28 C.F.R. §§ 35.160(b)(2); 35.164.

> Child welfare agencies should consult with and include organizations that support and advocate for the rights of individuals with disabilities in their policy-making and training efforts.

and administrative burdens, a child welfare agency or court need not provide it.[73]  These entities must nonetheless provide auxiliary aids or services that do not result in a fundamental alteration or undue burdens that place the individual with a disability on equal footing with individuals without disabilities to the maximum extent possible.

In order to be effective, auxiliary aids and services must be provided in a timely manner and in such a way as to protect the privacy and independence of the individual with a disability.[74]

Child welfare agencies and courts are prohibited from requiring individuals with disabilities to supply their own interpreters or other auxiliary aids and services.[75]  Child welfare agencies and courts may not rely on minor children accompanying individuals with disabilities to interpret, except in emergencies involving imminent threats to the safety or welfare of an individual or the public where no interpreter is available.[76]  Child welfare agencies and courts may rely on adults accompanying individuals with disabilities to interpret, but only in emergencies or where the individual with a disability specifically makes such a request, the accompanying adult agrees to provide such assistance, and reliance on that adult for such assistance is appropriate under the circumstances.[77]  State and local child welfare agencies and courts are also prohibited from placing a surcharge on a particular individual with a disability or any group of individuals with disabilities to cover the costs of the provision of auxiliary aids or other services that are required to provide that individual or group with nondiscriminatory treatment.[78]

9.    *What steps are child welfare agencies required to take to ensure that parents and prospective parents with disabilities involved with the child welfare system have an equal opportunity to participate in and benefit from their programs and activities?*

> Title II and Section 504 require that agency staff refrain from basing assessments, services, or decisions on assumptions, generalizations, or stereotypes about disability.

**Answer**:  Child welfare agencies are required to ensure that parents and prospective parents with disabilities involved in the child welfare system are afforded an opportunity to preserve their families and/or to become parents that is equal to the opportunity that the entities offer to individuals without disabilities.[79]

Agencies should take steps to ensure, for example, that investigators, social workers, supervisors, and others base their assessments of and decisions regarding individuals with disabilities on actual facts that pertain to the individual person, and not on assumptions, generalizations, fears, or stereotypes about disabilities and how they might manifest.  The child welfare agency's obligation to ensure individualized assessments applies at

---

[73] *See supra* footnote 67.
[74] 28 C.F.R. § 35.160(b)(2).
[75] 28 C.F.R. § 35.160(c)(1).
[76] 28 C.F.R. § 35.160(c)(2)(i), (3).
[77] 28 C.F.R. § 35.160(c)(2)(ii).
[78] *See* 28 C.F.R. § 35.130(f).
[79] 28 C.F.R. § 35.130(b)(1)(ii); 45 C.F.R. §§ 84.4(b)(1)(ii), 84.52(a)(2).

the outset and throughout any involvement that an individual with a disability has with the child welfare system.

Service plans for parents and prospective parents should address the individual's disability-related needs and the auxiliary aids and services the agency will provide to ensure equal opportunities. At the same time, service plans should not rely on fears or stereotypes to require parents with disabilities to accept unnecessary services or complete unnecessary tasks to prove their fitness to parent when nondisabled parents would not be required to do so.

Agencies also have an obligation to ensure that the aids, benefits, and services provided to parents and prospective parents in support of appropriate service plan activities and goals – such as visitation, parenting skills training, transportation assistance, counseling, respite, and other "family preservation services" and "family support services" – are appropriately tailored to be useful to the individual.[80] For example, if a child welfare agency provides transportation to visits for individuals without disabilities, it should provide accessible transportation to individuals with disabilities to ensure equal opportunity.

> Child welfare agencies should take steps to ensure that their obligations under Title II and Section 504 are met by reviewing the following:
>
> (1) existing policies, practices, and procedures;
> (2) how the agency actually processes cases;
> (3) the agency's licensing and eligibility requirements for foster parents and guardians; and
> (4) whether there are staff training or professional development needs.

To ensure that persons with disabilities have equal opportunity to retain or reunify with their children, it may be necessary for the agency to reasonably modify policies, practices, and procedures in child welfare proceedings. In general, agencies should consider whether their existing policies, practices, and procedures; their actual processing of cases; and their training materials comply with the nondiscrimination requirements of Title II and Section 504 for individuals with disabilities. Agencies should also take appropriate steps to ensure that components of child welfare processing, such as "fast-track" and concurrent planning, are not applied to persons with disabilities in a manner that has a discriminatory effect and that denies parents with disabilities the opportunity to participate fully and meaningfully in family reunification efforts.

In some instances, providing appropriate supports for persons with disabilities means selecting an appropriate alternative already provided in the Federal child welfare statutes. For instance, section 475 of the Social Security Act provides that the child welfare agency is required to file a petition to terminate parental rights when the child is in foster care for the preceding 15 out of 22 months. However, the law provides exceptions to this requirement and gives child welfare agencies the flexibility to work with parents who have a child in foster care beyond the 15 month

---

[80] "Family preservation services" are services for children and families to protect children from harm and to help families at risk or in crisis. 42 U.S.C. § 629a(a)(1); 45 C.F.R. § 1357.10(c). "Family support services" are community-based services to promote the safety and well-being of children and families, to increase the strength and stability of families in various ways, and to enhance child development. 42 U.S.C. § 629a (a)(2); 45 C.F.R. § 1357.10(c).

13

period, including parents with disabilities.[81]  Exceptions to the termination of parental rights
requirement include situations where: (1) at the state's discretion, the child is being cared for by
a relative; (2) there is a compelling reason for determining that filing the petition would not be in
the best interests of the child; or (3) the state, when reasonable efforts are to be made, has failed
to provide such services deemed necessary for the safe return of the child to his or her home. [82]
As to number (3), a child welfare agency should provide the family of the child with the services
necessary for the safe return of the child to the child's home in a manner that meets the unique
needs of the family.  Failure to provide services, including services to address family members'
disability-related needs, could qualify as an exception to the termination of parental rights
requirement.  Decisions about whether this exception applies to a situation in which the supports
necessary for a person with a disability to access services were not provided should be made on a
case-by-case basis.

Given the responsibilities of agencies discussed above, we also recommend that courts consider
whether parents and prospective parents with disabilities have been afforded an equal
opportunity to attain reunification, including whether they have been provided with appropriate
services and supports and other reasonable modifications to enable them to participate fully and
meaningfully in family preservation efforts.  Additionally, we suggest that courts consider
whether any reasonable modifications are necessary and should be made for parents with
disabilities.  We also recommend that courts consider evidence concerning the manner in which
the use of adaptive equipment or supportive services may enable a parent with disabilities to
carry out the responsibilities of parenting.

Foster care and adoption agencies must also ensure that qualified foster parents and prospective
parents with disabilities are provided opportunities to participate in foster care and adoption
programs equal to opportunities that agencies provide to individuals without disabilities.[83]   This
may require foster care and adoption agencies to reasonably modify policies, practices, and
procedures, where necessary to avoid discrimination on the basis of disability.  For example, an
adoption agency may be required to provide large print and electronically accessible adoption
materials to accommodate the known needs of a visually impaired adoption program applicant.

*10.     When a child welfare agency or court provides or requires an assessment of a parent
during the processing of the child welfare case, what do Title II and Section 504 require
regarding the assessment?*

**Answer**: Title II and Section 504 require that assessments be individualized.[84]   An
individualized assessment is a fact-specific inquiry that evaluates the strengths, needs, and
capabilities of a particular person with disabilities based on objective evidence, personal
circumstances, demonstrated competencies, and other factors that are divorced from
generalizations and stereotypes regarding people with disabilities.  Child welfare agencies and
courts may also be required to provide reasonable modifications to their policies, practices, or

---

[81] 42 U.S.C. § 675(5)(E); 45 C.F.R. § 1356.21(i).
[82] 42 U.S.C. § 675(5)(E)(i)-(iii); 45 C.F.R. § 1356.21(i)(2)(i)-(iii).
[83] 42 U.S.C. § 12132; 29 U.S.C. § 794(a); 28 C.F.R. pt. 35 (Title II); 28 C.F.R. pt. 42, subpt. G (DOJ Section 504
regulation); 45 C.F.R. pt. 84 (HHS Section 504 regulation).
[84] *See* 28 C.F.R. pt. 35, App. B; *cf. PGA Tour, Inc. v. Martin*, 532 U.S. 661, 690 (2001) (explaining that an
individualized inquiry is among the ADA's most "basic requirement[s].").

> Child welfare agencies may be required to modify their own services, or, when necessary, to arrange for services outside of the agency, in order to ensure equal opportunity for parents and prospective parents with disabilities

procedures and/or appropriate auxiliary aids and services during assessments to ensure equal opportunities for individuals with disabilities. For example, a child welfare agency or court may be required to provide a qualified sign language interpreter to accommodate an individual with a communication disability during an evaluation to ensure an accurate assessment.

*11.    How does the equal opportunity requirement apply to case planning activities of child welfare agencies?*

**Answer**: The equal opportunity requirement applies throughout the continuum of a child welfare case, including case planning activities. In many instances, providing the same services and resources to an individual with a disability that are provided to individuals without disabilities will not be sufficient to provide an equal opportunity to an individual with a disability. Where this is the case, Title II and Section 504 may require agencies to provide additional, individually tailored services and resources to meet the requirement to provide an equal opportunity to participate in and benefit from the program. For example, when providing training to parents, agencies should consider the individual learning techniques of persons with disabilities and may need to incorporate the use of visual modeling or other individualized techniques to ensure equal opportunity to participate in and benefit from the training.

Staff should consider whether the agency is appropriately assisting family members in meeting service plan tasks and case goals, and whether modifications must be made. For example, if parenting training is not working, staff should evaluate whether there are any unnecessary barriers to the training that could be removed or reasonably modified, such as increased opportunities for modeling behavior. Agencies should also ensure that staff members develop appropriate service plan tasks and goals that address the individualized needs of all affected family members with disabilities, recognizing that allowing parents with disabilities to use family members as part of their support network may be appropriate.

*12.    Is an agency required to arrange for services to parents and prospective parents with disabilities that are necessary to avoid discrimination but are not available within the agency's programs?*

**Answer**: In addition to providing to parents with disabilities all reunification services that it provides to parents without disabilities, a child welfare agency may be required, under Title II and Section 504, to arrange for available services from sources outside of the agency as a reasonable modification of its procedures and practices for parents with disabilities so long as doing so would not constitute a fundamental alteration. Arranging for such services from outside sources may be necessary to provide an equal opportunity to participate in and benefit from the agency's programs. Many specialized services to support persons with disabilities are often available from other social service agencies, as well as disability organizations. For example, for a person with a mental health disability, mental health services and supports, such as supportive housing, peer supports, assertive community treatment, and other community-based supports are often available from mental health service agencies. Child welfare agencies should coordinate with such agencies and organizations to ensure that parents and prospective parents with

15

disabilities receive the most complete set of support services possible, and also to ensure that reunification and other services are specifically tailored to their needs.[85]  This requirement does not change an entity's responsibility to make available those reunification services provided to parents without disabilities or to reasonably modify them to provide equal opportunity.

*13.    Are child welfare agencies and courts permitted to impose a surcharge on persons with disabilities for the provision of reasonable modifications or auxiliary aids and services?*

**Answer**:  No.  Title II prohibits the imposition of surcharges to cover the costs of measures required to provide an individual with nondiscriminatory treatment.[86]  For example, child welfare agencies and courts may not charge persons with disabilities for any costs associated with providing effective communication during visitation, meetings, and court hearings, and may be required to provide transportation to accessible facilities when needed to fulfill their program access obligations.

*14.    Child welfare agencies have an obligation to ensure the health and safety of children. How can agencies comply with the ADA and Section 504 while also ensuring health and safety?*

**Answer**:  Under child welfare law, child welfare agencies must make decisions to protect the safety of children.  The ADA and Section 504 are consistent with the principle of child safety. For example, the ADA explicitly makes an exception where an individual with a disability represents a "direct threat."[87]  Section 504 incorporates a similar principle.[88]

Under the ADA and Section 504, a direct threat is a significant risk to the health or safety of others that cannot be eliminated by a modification of policies, practices, or procedures, or by the provision of auxiliary aids or services.[89]  In determining whether an individual poses a direct threat to the health or safety of a child or others, child welfare agencies and courts must make an individualized assessment, based on reasonable judgment that relies on current medical knowledge or on the best available objective evidence, to ascertain the nature, duration, and severity of the risk to the child; the probability that the potential injury to the child will actually occur; and whether reasonable modifications of policies, practices, or procedures will mitigate the risk.[90]

As such, in some cases an individual with a disability may not be a qualified individual with a disability for child placement purposes.  What both the ADA and Section 504 require, however, is that decisions about child safety and whether a parent, prospective parent, or foster parent represents a direct threat to the safety of the child must be based on an individualized assessment and objective facts and may not be based on stereotypes or generalizations about persons with disabilities.[91]

---

[85] *See* 28 C.F.R. § 35.130(b)(1)(i)-(iv), (b)(7).
[86] *See* 28 C.F.R. § 35.130(f).
[87] 28 C.F.R. § 35.139.
[88] *See Arline*, 480 U.S. 273.
[89] 28 C.F.R. § 35.139(b).
[90] *Id.*
[91] *See* 28 C.F.R. § 35.139.

*15.     What are some other best practices for child welfare agencies and courts?*

**Answer**:  We recommend that child welfare agencies and courts review and update their policies and procedures on a regular basis to ensure that they comply with the ADA and Section 504.  We recommend that child welfare agencies and courts also ensure that their employees and contractors are sufficiently trained in ADA and Section 504 compliance.  In addition, we recommend that they look for ways to coordinate with disability organizations and agencies to assist in service planning and to support them in their efforts to ensure equal opportunity for parents and prospective parents with disabilities.

**How can aggrieved persons file a complaint?**

*16.     What can individuals do when they believe they have been subjected to discrimination in violation of Title II or Section 504?*

**Answer:**  An aggrieved person may raise a Title II or Section 504 claim in child welfare proceedings.  Additionally, subject to certain limitations, an aggrieved person may pursue a complaint regarding discrimination in child welfare services, programs, or activities under Title II or Section 504 in federal court. [92]

Aggrieved individuals may also file complaints with HHS and DOJ.  HHS and DOJ also have authority to initiate compliance review investigations of child welfare agencies and courts with or without receiving a complaint.  If an investigation of a complaint or a compliance review reveals a violation, HHS or DOJ may issue letters of findings and initiate resolution efforts. [93] DOJ may initiate litigation when it finds that a child welfare agency or court is not in compliance with Title II.  HHS may also refer cases to DOJ for litigation where a violation is found and is not voluntarily resolved. [94]

Title II and Section 504 allow for declaratory and injunctive relief, such as an order from a court finding a violation and requiring the provision of reasonable modifications.  Title II and Section 504 also allow for compensatory damages for aggrieved individuals.  Individuals who prevail as parties in litigation may also obtain reasonable attorney's fees, costs, and litigation expenses. [95]

Under Section 504, remedies also include suspension and termination of Federal financial assistance, the use of cautionary language or attachment of special conditions when awarding Federal financial assistance, and bypassing recalcitrant agencies and providing Federal financial assistance directly to sub-recipients. [96]

---

[92] *See* 28 C.F.R. §§ 35.170-172; 45 C.F.R. § 84.61; *see also* 28 C.F.R. § 42.530.  In addition, child welfare agencies and courts that employ 50 or more persons are required to have grievance procedures for prompt and equitable resolution of complaints alleging actions prohibited by Title II and Section 504.  28 C.F.R. § 35.107; 45 C.F.R. § 84.6; *see also* 28 C.F.R. § 42.505.
[93] 28 C.F.R. §§ 35.172(c), 35.173; 45 C.F.R. § 84.61; *see also* 28 C.F.R. § 42.530.
[94] 28 C.F.R. § 35.174; 45 C.F.R. § 84.61.
[95] 42 U.S.C. § 12205; 29 U.S.C. § 794a(b); 28 C.F.R. § 35.175.
[96] *See* 42 U.S.C. § 2000d-1.

**Additional Resources**

For more information about the ADA and Section 504, you may call the DOJ's toll-free ADA information line at 800-514-0301 or 800-514-0383 (TDD), or access its ADA website at www.ada.gov.  For more information about the responsibilities of child welfare agencies under the ADA and Rehabilitation Act, see "DOJ/HHS Joint Letter to Massachusetts Department of Children and Families," at www.ada.gov/new.htm.  For more information about Title II of the ADA, including the Title II Technical Assistance Manual and Revised ADA Requirements: Effective Communication, see www.ada.gov/ta-pubs-pg2.htm.

Information about filing an ADA or Section 504 complaint with DOJ can be found at www.ada.gov/filing_complaint.htm.  Individuals who believe they have been aggrieved under Title II or Section 504 should file complaints at the earliest opportunity.

You can also file a Section 504 or Title II ADA complaint with OCR at http://www.hhs.gov/ocr/civilrights/complaints/index.html.

General information about civil rights and child welfare issues can be found at: http://www.hhs.gov/ocr/civilrights/resources/specialtopics/adoption/index.html.

For information about ACF's Children Bureau, please visit: http://www.acf.hhs.gov/programs/cb.

For ACF and OCR regional offices, please visit:

- http://www.acf.hhs.gov/programs/oro
- http://www.hhs.gov/ocr/office/about/rgn-hqaddresses.html

Duplication of this document is encouraged.

August 2015

FILED
FAMILY COURT DIV.

**State of Minnesota**                                              **District Court**

| County | 2013 JUL 11 PM 2:01 | Judicial District: |
| | | Court File Number: *27- FA-134239* |
| | COURT ADMINISTRATOR | Case Type: |

☐ In Re the Marriage of:

☐ In Re the Custody of:

*CHRISTINE ELAINE HENDERSON*

Name of Petitioner

and
*EDWARD HENDERSON*

Name of Respondent

☐ **Petitioner's**   ☒ **Respondent's**
**Parenting / Financial Disclosure
Statement**
(Minn. Gen. R. Prac. 305)

1.  **Background Information**            **Petitioner**            **Respondent**

    a.  Full Name                    *CHRISTINE*            *EDWARD ANDREW HENDERSON*

    b.  Age                          *37*                   *30*

    c.  Years of Marriage            *7*                    *7*
        (if applicable)

    d.  Separation Date              *N/A*                  *N/A*
        (if applicable)

    e.  Present Mailing Address      *2739 16th AVE S*      *2739 16 AVE S MPLS*
                                     *MPLS MN 55407*        *MN 55407*

2.  **Court Order(s) Prohibiting Contact**

    a.  Is there an existing court order between you and the other party?  (check all that apply)

        ☐  Harassment Restraining Order (HRO)

        ☐  Domestic Abuse Order for Protection (OFP)

        ☐  No Contact Order

        ☐  Other court order prohibiting contact with the other party: _____

b.  Have you been or are you now afraid of the other party? ☐ Yes ☒ No
    If yes, please explain: _____
    _____

3.  **Information Regarding The Minor Joint Children**
    List the names, birth dates, and ages of the minor joint child(ren) of this legal action:

| Full Name of Child | Birth Date | Age |
|---|---|---|
| JACOB CCHAROLS DANGOR LOWDORSON | 5/17/2008 | 5 |
| | | |
| | | |
| | | |

a.  Do any of the minor joint children have special needs? ☐ Yes ☒ No
    If yes, please explain: _____

b.  Is there an agreement regarding parenting time? ☐ Yes ☒ No
    If yes, what is the parenting time arrangements for the child(ren)? _____

c.  Have you and the other party created a parenting plan? ☒ Yes ☐ No

d.  Is there an agreement regarding legal custody of the child(ren)? *Legal custody means having a right to participate in the major decisions regarding the child's life, including education, religious upbringing and medical treatment.*

    ☐ Yes ☒ No
    If yes, what is the legal custody agreement? _____
    _____

e.  Is there an agreement regarding physical custody of the child(ren)? *Physical custody identifies who will handle the routine daily care and control of the child, and who the child will live with.*

    ☐ Yes ☒ No
    If yes, what is the physical custody agreement? _____
    _____

f.  If you have other nonjoint children, list first and last initials of each nonjoint child's name, age and date of birth:
    _____

g.  Is the wife now pregnant? ☒ NO  ☐ YES, the due date is: _____ .(if applicable)

h.  Please indicate the name of the agency used for complying with the education requirement and the date scheduled or attended: _____

4.  **Employment and Income:**

a.  Are you employed? ☒ Yes  ☐ No

If yes, where? _R42NBOW 7AXZ_____

Length of employment: _2,1_____

| Monthly Income Received | Amount | Monthly Income Received | Amount |
|---|---|---|---|
| Salary and Wages (before deductions | $ 324.24 por week | Social Security Received (social security disability, retirement, survivors' benefit) | $ 0 |
| Self-Employment | $ 0 | Child's Derivative Social Security or Veteran's Benefits | $ 0 |
| Unemployment Benefits | $ 0 | Workers' Compensation | $ 0 |
| Commissions - Average | $ 0 | Pension or Annuity Payments | $ 0 |
| Spousal Maintenance Received | $ 0 | Military and Naval Retirement | $ 0 |
| Bonus income - Average | $ 0 | Other source of income (list source below) | $ 0 |
| Supplemental Security (SSI) | $ 0 | | |
| **Total monthly income received:** | | | $ 1300 |

b.  Do you or the other party receive any child support for nonjoint children?

☐ Yes  ☒ No

If Yes, state who receives it and how much per month: _____

c.  Are you or the joint children currently receiving any form of **public assistance?**

☐ Yes  (check all that apply)  ☐ No

☐ Cash public assistance (MFIP)  ☐ Food Stamps  ☐ General Assistance

☐ Medical Assistance  ☒ MinnesotaCare  ☐ Child Care Subsidy

☐ Diversionary Work Program (DWP)  ☐ TEFRA  ☐ Other : _____

d.  If you checked any boxes above in 4c above, did you serve the County Attorney's Office with a copy of your documents, as required?  ☐ Yes  ☒ No

e.  If you are not working, what is your source of income or support?  _____

_____

_____

5.  **Monthly Living Expenses**

| Expense Type | Cost | Monthly Income Received | Amount |
|---|---|---|---|
| Rent / Mortgage Payment | $ P | Transportation  (car payment, gasoline, bus, taxi | $ 75 |
| Contract for Deed / 2ⁿᵈ Mortgage | $ ? | Medical and Dental Expenses (not covered by insurance) | $ D |
| Homeowner's / Rental Insurance | $ D | Cable TV / Internet | $ N/A |
| Property Taxes (if not included in mortgage payment) | $ | Car Insurance | $ 77 |
| Heating & Electric | $ P | Clothing | $ 50 |
| Food | $ 400 | Other Spousal Maintenance payments | $ D |
| Telephone / Cell Phone | $ D | Other Child support payments | $ D |
| Child Care Payments | $ D | Other Miscellaneous payments | |
| Total monthly expenses: | | | $ |

6.  **Monthly Withholdings:**

a.  Federal Income Tax Deductions      $ O _____

b.  State  Tax Deductions:          $ O _____

   Social Security (FICA) and Medicare  $ #101 _____

   Retirement Contribution        $ O _____

   Union Dues              $ O _____

   Health Care / Medical         $ O _____

   Dental Coverage           $ O _____

c.  Other Paycheck Deductions (specify)

   _____        $ _____

   _____        $ _____

d.  Subtotal Deductions          $ 101 _____

e.   NET TAKE HOME PAY                         $ 1300

f.   Tax withholding figures above are
     based on Married/Single taxpayer
     status with what number of
     deductions? (Example: M-4 or S-2)         _____

g.   Do you have medical and dental insurance coverage in place? ☐ Yes ☒ No
     If so, who is covered? _____

Questions 7 through 11 apply only for marital dissolution actions.

7.   **Real Property**: Provide the following information for real property owned by you and/or
     your spouse. If more room is needed, attach another sheet of paper labeled as Exhibit 7A.

|     |                              | Homestead       | Other Property |
| --- | ---------------------------- | --------------- | -------------- |
| a.  | Date Acquired                | UNKNOWN         |                |
| b.  | Purchase Price               | $ UNKNOWN       | $              |
| c.  | Present Fair Market Value    | $ UNKNOWN       | $              |
| d.  | Balance due on Mortgage      | $ UNKNOWN       | $              |
| e.  | Present Net Value (c – d)    | $ UNKNOWN       | $              |
| f.  | Monthly Payment (PITI)       | $ UNKNOWN       | $              |
| g.  | Rental Income, if any        | $ 0             | $              |

8.   **Personal Property**: List the fair market value of the following personal property owned by
     you or your spouse:

     a.   Checking, Savings Accounts (list)

          US FED SAVINGS                        $ 5.11
          US FED CHECKING                       $ 15.53
          _____              $

     b.   Investment Accounts, Mutual Funds, Stocks, Bonds, etc. (list)    0
          _____      $ 0
          _____      $

c.  IRAs, Profit Sharing Plans, Savings Plans (e.g. 401K), Pension, etc.

_____   $ _O_____

_____   $ _O_____

d.  Annuities

_____   $ _O_____

_____   $ _O_____

e.  Household goods and furnishings (including audio/video/computer)

_2_ COMPUTER, TABLET   $ ~~500~~ 200

f.  Vehicles, Boats, Campers, Snowmobiles, Aircraft, Trailer, etc.:

N2647 HAWK 550 HONDA   $ ~~500~~ 1000

N2SAN PATHFINDER   $ 2500

_____   $ _____

_____   $ _____

g.  Farm machinery, equipment, animals, crops, seed, etc.:

_____   $ _O_____

_____   $ _O_____

_____   $ _O_____

h.  Business or Partnership Interests

_____   $ _O_____

i.  Intellectual Property, such as patents, copyrights, etc.

_____   $ _O_____

j.  Other

_____   $ _O_____

9.  **Nonmarital Claims**

Are you making any claim for nonmarital property?   ☐ Yes  ☒ No

If yes, list items claimed as nonmarital below:          Amount Claimed

_____   $ _____

_____ $ _____

_____ $ _____

10. **Life Insurance:** List all insurance policies owned by you and your spouse.

|  | **Policy 1** | **Policy 2** | **Policy 3** |
|---|---|---|---|
| Company | _____ | _____ | _____ |
| Type (Whole or Term) | _____ | _____ | _____ |
| Death Benefit | $_____ | $_____ | $_____ |
| Cash Value | $_____ | $_____ | $_____ |
| Loan Balance | $_____ | $_____ | $_____ |
| Insured under the policy | _____ | _____ | _____ |
| Beneficiary | _____ | _____ | _____ |
| Owner of policy | _____ | _____ | _____ |

11. **Debts:** List all debts not already listed in paragraph 7. If more room is needed, attach a schedule.

| Type of Debt (credit card, bank loan, etc.) | Debt Owed To | Minimum Monthly Payment | Balance Due |
|---|---|---|---|
| UNKNOWN | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

Are you involved in any bankruptcy proceedings?  ☐ Yes  ☒ No

Do you intend to file bankruptcy?  ☒ Yes  ☐ No

12. **Documentary Information:** Provide your three (3) most recent paystubs from your employment, your most recent Federal Tax Returns with all attachments, including W-2s and

1099s, and any statements from unemployment compensation, workers' compensation, social security benefits statements, and all other documents evidencing earnings or income received during the last three months, including any public financial assistance in money or in-kind services (grants, heating assistance, rental assistance, etc.)

**NOTE:** These documents contain your private information. To keep it private, fill out Sealed Financial Source Document (court form CON112) and use it as the cover page for your financial documents. See Minn. Gen. R. Prac. 11 for more information.

The statements made by me in this Parenting / Financial Disclosure Statement are true and correct to the best of my knowledge.

DATED: 7/11/2013

Signature of ☐ Petitioner ☑ Respondent

_____
Signature of Attorney (if any)

Attorney Name: _____

Address: _____

City/State: _____

Telephone: (____) _____

Attorney I.D.: _____

**RAINBOW TAXI CORPORATION**

63464

Edward A. Henderson
2739 16th Ave South
Minneapolis
MN, 55407

| PAY | Hours | Rate | Current | YTD |
|---|---|---|---|---|
| Regular Pay | 8.10 | 13.25 | 107.33 | 7424.01 |
| 2nd Hourly | - | 11.00 | 0.00 | 627.00 |
| M_Holiday Pay | - | 20.00 | 0.00 | 160.00 |

| TAXES | Current | YTD |
|---|---|---|
| Federal Income Tax | 0.00 | 33.71 |
| Social Security | 6.65 | 509.08 |
| Medicare | 1.56 | 119.06 |
| MN Income Tax | 0.00 | 0.00 |

Rainbow Taxi Corporation
3736 Minnehaha Ave South
Minneapolis
MN, 55406

| DEDUCTIONS | Current | YTD |
|---|---|---|
| Cash Advance Repayment | 0.00 | 484.81 |

| OTHER PAY | Current | YTD |
|---|---|---|

Pay Period
06/03/2013 - 06/09/2013

Pay Date
06/12/2013

MEMO:

| BENEFITS | Used | Available |
|---|---|---|

| SUMMARY | Current | YTD |
|---|---|---|
| Total Pay | $107.33 | $8,211.01 |
| Taxes | $8.21 | $661.85 |
| Deductions | $0.00 | $484.81 |

**NET PAY:** $99.12

CONFIDENTIAL

**State of Minnesota**                                    **District Court**

| County Hennepin | Judicial District: 4th |
| | Court File Number: 27-FA-13-4239 |
| | Case Type: General |

Christine Sobers
_____
Petitioner

vs.                                    **Supplemental Affidavit**
**for Proceeding**
**In Forma Pauperis**
**(Minn. Stat. § 563.01)**

B Edward Andrew Henderson
_____
Respondent

STATE OF MINNESOTA        )
                          ) SS
COUNTY OF _Hennepin____   )
    (County where *Affidavit* signed)

1.    I am a party in this action and make this request in good faith.

2.    (Check one of the following:)

☑    An order allowing me to proceed *in forma pauperis* without paying filing fees, service and publication fees, and copy fees has previously been issued in this case.

Or

☒    I have completed and attached an "Affidavit for Proceeding *In Forma Pauperis*."

3.    I am asking for an order directing the payment of the following costs by the state courts:
    a.    ☐   Witness/expert witness for:_____
          ☐ Trial          ☐ Deposition

          Name and address of witness:_____
          _____
          _____

          I expect this witness to provide the following evidence or testimony (please give a general description):
          _____
          _____
          _____

          I estimate the costs for this witness to be:
                    Subpoena        $_____
                    Service Fee     $_____

**State of Minnesota**                                          **District Court**

| County | |
|---|---|
| Hennepin | |

| | |
|---|---|
| Judicial District: | 4th |
| Court File Number: | 27-FA-13-4239 |
| Case Type: | General |

*Christine Sobers*
Petitioner

**Supplemental Order
for Proceeding
In Forma Pauperis
(Minn. Stat. § 563.01)**

vs.

*Edward Andrew Henderson*
Respondent

Upon the affidavit of *Edward Henderson* and based on the authority of Minn. Stat. § 563.01, the Court makes the following Findings of Fact and Conclusions of Law:

☐ Petitioner's claim is not frivolous, and petitioner is entitled to proceed under Minn. Stat. § 563.01.

☐ _____ is a witness to this case, has evidence material and necessary to this case and is within the State of Minnesota.

☐ In order to adequately prepare, present or decide an issue presented by this action, it is necessary to depose _____ _____ and prepare a transcript of that deposition.

☐ In order to adequately prepare, present or decide an issue presented by this action, it is necessary to obtain a transcript of the hearing, trial, or deposition held on _____.

☐ Other: _____

☑ Applicant is not entitled to expenses.

**IT IS ORDERED:**

The following costs to be paid by the state courts:
☐ Witness expenses incurred in subpoenaing _____ and the fees and costs of this witness not to exceed $_____.

☐ Deposition expenses incurred in deposing _____ and the costs of obtaining a transcript of the deposition not to exceed $_____.

☐ Expenses incurred in obtaining a transcript of the hearing, trial, or deposition held on _____ not to exceed $_____.

☐ Other: _____
   Not to exceed: $_____.

☐ If money is recovered in this action, these costs shall be paid directly to the court administrator by the losing party.

☑ The application for payment of expenses is denied.

Dated: 10/11   The Foregoing Order is Recommended

Judge of District Court

IFP105      State     ENG     Rev 5/06      www.mncourts.gov/forms      Page 1 of 1

Mike Furnstahl, District Court Referee,
4th Judicial District

CONFIDENTIAL

Mileage                    $_____
Attendance Fee             $_____
Other_____               $_____

b. ☑ Transcript expenses:
   Date of hearing, trial or deposition:    _See attached_ _9u DATES_
   _CZRCALED_

   I need a copy of this transcript for the following reasons:
   _DOJ_ _Requested_ _Review_
   _____
   _____
   _____
   _____

   I estimate the costs of obtaining this transcript to be:
   Court reporter fees    $ _3150_
   Copy fees              $_____
   Other;_____          $_____

c. ☐ Other expenses:
   _____
   _____
   _____
   _____

   These expenses are necessary because:
   _____
   _____
   _____
   _____

   Estimated costs:       $_____

I declare under penalty of perjury that everything I have stated in this document is true and correct. Minn. Stat. § 358.116.

Dated: _Sept 11, 2018_ 

Signature
Name:  _Edward Henderson_
Address:  _2512 19th Ave S #2_
City/State/Zip:  _Mpls, MN 55404_
Telephone:  _(612) 940-3791_
E-mail address:  _communityisaverb @_
_gmail.com_

Section 504 of the Rehabilitation Act and Title II of the ADA mandates access to family law courts. Indeed, DOJ considers court actions to be "state activity" for purposes of the ADA. In addition, entities that receive federal financial assistance from DOJ, including state judicial systems, are prohibited from discrimination on the basis of disability under Section 504 of the Rehabilitation Act.[503] The Supreme Court has held that providing people with disabilities with access to courts is a mandate of Title II. According to the Court, "Unequal treatment of disabled persons in the administration of judicial services has a long history," which the ADA has sought to redress.[504]

Must provide parents with disabilities with an equal opportunity to participate in programs, services, and activities.[505] To implement this mandate, the courts must make reasonable modifications in policies, practices, or procedures unless such modifications would fundamentally alter the nature of the service, program, or activity.[506]

- Should administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified people with disabilities.[507]
- May not impose or apply eligibility criteria that screen out or tend to screen out any person with a disability from fully and equally enjoying any service, program, or activity, unless such criteria can be shown to be necessary for the provision of the service, program, or activity being offered.[50]8
- Must furnish auxiliary aids and services when necessary to ensure effective communication, unless an undue burden or fundamental alteration would result.[509]
- May provide benefits, services, or advantages beyond those required by the regulation to people with disabilities.[510]
- May not impose surcharges on people with disabilities to cover the costs of measures to ensure nondiscriminatory treatment, such as making necessary modifications required to provide program accessibility or providing qualified interpreters.[511]
- May not deny the benefits of programs, activities, and services to people with disabilities because entities' facilities are inaccessible.[512]

Under title III, the Department of Justice may also obtain civil **penalties** of up to $55,000 for the first **violation** and $110,000 for any subsequent **violation**. ... issue regulations that include enforceable accessibility standards applicable to facilities subject to title II or title III that are consistent with the "**minimum** guidelines" issued ...

That per the findings of Griffin v Illinois regarding the rights of indigent persons to their transcripts for the use of evidence, that I the indigent persons be granted court transcripts which clearly document the offenses for use as evidence in this case concerning life liberty and property at no cost to myself.

That per ADA Title II, that I be accommodated with an interper of law

That per ADA Title II, Sections 508-512, that all persons seeking paperwork from the Family Courts be notified of their right to ADA accommodations starting with the Clerk of Courts, and

that all those with disabilities or considered to have disabilities are able to go through an intake process to document their disabilities and give reasonable accommodation, including but not limited to those which are a) suggested by the Court as being affective b) those which are both suggested by the individual and found to be reasonable, and c) the right to an interpreter of the law both for filling out of legal paperwork and in the courtroom.

That Hennepin County courts receive mental health sensitivity training and training on learning disabilities by NAMI

That the Guardian ad Litems office of Hennepin County receive sensitivity training on poverty, people of color, alternative lifestyles, mental health and learning disabilities, LGBTQ as well as a refresher course on what the ADA covers.

An investigation by the DOJ into the practices of the Hennepin County Guardian ad Litems office, with a review of their findings by the MN Disability Law Center.

The results of that investigation to be made public, available, and easily accessible on the MN Court website

That a formal apology be given from the State to all individuals with disabilities residing there in.

That a signed copy of that apology be issued to myself and my son Jacob.

That these services be viable functional within 2 years of the verdict and that no less than $8,000,000 (or whatever greater amount the Courts deem equitable) be spent on implementing these changes by the state of Minnesota due to their misconduct with regards to the ADA.

That for emotional, financial, educational detriment and hardship that $2,000,000 to be divided 80/20 between my son and I, 20% being Jacob's and his portion being stored without his access till he is 37 years of age, with the exception of tuition and school supplies in which he will have to access through Meghan Decker (his godmother).

That all of Christine's legal fees be reimbursed.

That full payment of those fines to be carried out within 4 months of the ruling.

That fines for late  payment at a rate of 10% interest on remaining balance to be split 60/40 between the disability law center and myself with myself receiving the 40% and that 40% being split 50/50 between myself and Jacob.

That counsel be provided for indigent individuals desiring such in Family and Civil Courts.

And whatever else the Court deems equitable.